

**FILED**
Jul 31 2015, 9:41 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Harold Bishop,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

July 31, 2015

Court of Appeals Case No.
49A02-1409-CR-622

Appeal from the Marion Superior
Court

The Honorable Mark D. Stoner,
Judge

Cause No. 49G06-1209-MR-61990

**Brown, Judge.**

[1] Harold Bishop appeals his conviction for murder. Bishop raises four issues, which we consolidate and restate as whether the trial court abused its discretion in admitting certain evidence. We affirm.

*Facts and Procedural History*

[2] On the morning of Saturday, September 1, 2012, at about 8:00 a.m., Pamela Dunlap and her neighbor Michael Armbruster were biking near the State Fairgrounds heading toward the Monon Trail in Indianapolis. As they approached the intersection at 38th Street and Winthrop Avenue, they observed a man, later identified as Khalfani Shabazz, on a porch sitting down, halfway in the doorway with his body propping open the front door, yelling "[o]h my God, oh my God," and "help." Transcript at 283. Armbruster and Dunlap dialed 911 and told Shabazz help was on the way.

[3] Indianapolis Metropolitan Police Department ("IMPD") Officer Haskell Shaffer received the run to the scene and arrived about three to four minutes later. Armbruster and Dunlap flagged down Officer Shaffer and directed him to the porch, and Officer Shaffer approached Shabazz, observed that Shabazz had suffered trauma to his chest and stomach area and was bleeding, and asked him who he was and who had shot him. Shabazz did not respond and stared at Officer Shaffer with a blank stare, and Officer Shaffer could not determine whether Shabazz was aware of his surroundings. Soon after, other officers arrived and "cleared" the home to make sure others were not inside, and paramedics Kimberly Johnson and Adrian Foster arrived and approached Shabazz on the porch and found a driver's license in his pocket. *Id.* at 299. The

paramedics observed that Shabazz had suffered five gunshot wounds including shots to the chest, the left shoulder, the left arm, the third right finger, which was almost amputated by a bullet that was still lodged within it, and a graze wound to the top of the head. The paramedics administered oxygen using a nano-breather to Shabazz, who was sweating profusely. Johnson observed that Shabazz was trying to catch his breath and unable to speak in complete sentences, and she believed he was in shock. Johnson believed that, based on Shabazz's physical state, he required immediate transport to Wishard Hospital, and the paramedics loaded him into the ambulance for transport.

[4] In the ambulance, the paramedics noticed that Shabazz was starting to "compensate," which meant that his blood was collecting in and around the areas of his major organs in order to keep him alive. *Id.* at 418. Shabazz had no blood pressure, and the paramedics administered two IVs using "the largest angio" that they could "so that a lot of fluid can get in the veins quickly" in an attempt to raise his blood pressure. *Id.* at 419. However, even after the IVs were provided, Shabazz's blood pressure "was only 80 which is pretty low." *Id.* at 421. Shabazz asked multiple times while in the ambulance if he was going to die, and although Johnson believed he would not live, she told him "he was going to be okay" to try and comfort him. *Id.* at 420.

[5] When the ambulance arrived at the hospital, Shabazz was taken to a shock room for immediate medical attention. While he was awaiting surgery, IMPD Sergeant and Investigator John Maloney, with the aggravated assault division, as well as IMPD Homicide Detective Mark Prater, arrived, and each spoke

with Shabazz separately. Detective Prater first spoke with him, asked who shot him, and Shabazz responded: "Zimbabwe." *Id.* at 363. Shabazz also told him that Zimbabwe drove a grey car and that the shooting "was over a job they were doing on South Meridian Street." *Id.* at 364. The conversation lasted for about ten or fifteen seconds. Sergeant Maloney then met with Shabazz and asked who shot him, and at first he could not understand Shabazz's response "[b]ecause [Shabazz] was speaking very low and he had the oxygen mask on," and he noticed that Shabazz was having trouble breathing. *Id.* at 346. After removing the oxygen mask, Sergeant Maloney asked again and Shabazz responded: "Zimbabwe." *Id.* Shabazz told him that Zimbabwe was black, that he had a grey vehicle, and that Shabazz and Zimbabwe "had worked together on a job on the south side on Meridian Street" and that a dispute over money from that job had arisen. *Id.* at 346-347. Sergeant Maloney was able to speak with Shabazz for about a minute before he was wheeled off to surgery.

[6] Shabazz died in surgery at 1:41 p.m. that day. Upon his death, IMPD Homicide Detective Charles Benner was assigned as lead detective, and he met with the officers who had taken part in the investigation, as well as friends and family of Shabazz including his fiancée Shelinda Kerr. During Detective Benner's interview with Kerr, she identified the man she knew as Zimbabwe from a photo array, and the person she identified was Bishop. Kerr had known Zimbabwe since July of 1998 as a friend and partner in construction work with Shabazz. Detective Benner also met with a man named Carl Alsum, who was

referred to him by Kerr, and who also identified Bishop as Zimbabwe from a photo array.

[7]     Also, on September 1, 2012, IMPD Crime Lab Investigator Michael Hasty went to Shabazz's home to collect evidence which included, among other things, three spent shell casings, and he transported the evidence to the Crime Lab. On September 2, 2012, Dr. Joyce Carter conducted an autopsy of Shabazz's body and noted that he suffered gunshot wounds including an abrasion to the top of his head, a wound in his left arm, a wound in the back of his left shoulder, a wound to the right side of his chest, and a wound to his third right finger that nearly amputated the finger. The shot to his chest caused serious damage to his body, including fracturing two ribs, a huge tear to his liver of approximately eight inches in length, holes in his diaphragm, damage to his hepatic vein, a hole in his right lung, as well as tremendous bleeding. She noted that the doctors during surgery applied eleven gauze sponges to the wound, each of which is capable of holding a cup to a cup and a half of blood, which, combined with the blood found in the abdomen and right chest cavity, amounted to about four and a half liters of blood loss.

[8]     On September 7, 2012, the State charged Bishop with the murder of Shabazz. On September 12, 2012, Boone County Sheriff Deputies Bradley Dunn and Jesse Boggs were dispatched to the area of 600 South 650 West, which was a rural location surrounded by corn fields, farm land, and some woods to investigate a suspicious person. When the deputies arrived on the scene, they observed a black male sitting on a phone utility box near the northwest corner

of the intersection. Deputy Dunn approached the man, later identified as Bishop, and asked him what he was doing, and Bishop responded that "he has warrants." *Id.* at 454. Deputy Dunn asked what the warrants were for, and Bishop said "for shooting people." *Id.* Bishop spelled his name for the deputies, and Deputy Dunn then realized that he was the person they "were supposed to be looking for."[1] *Id.* The deputies confirmed that there were warrants out for Bishop, and Bishop told them that "[h]is car was in the woods." *Id.* at 455. Deputy Dunn arrested Bishop and took him to jail where he was handed off to IMPD. Other Boone County Sheriff's Deputies later discovered Bishop's car, a grey Mazda which had been smeared with mud to act as camouflage, about two to three hundred feet from the road in a wooded area.

[9]     On December 11, 2012, the State filed a motion for joinder of offenses for the purposes of trial under the instant cause number as well as under cause numbers 49G06-1209-FA-061989 ("Cause No. 61989") and 49G06-1209-FA-061225 ("Cause No. 61225"). In its motion, the State noted that the conduct underlying Cause No. 61989 involved "the attempted murder and aggravated battery of Shana Ford-Gogoua and Zackery Joseph that took place on September 1, 2012 (at around 6:44 am)," and that Cause No. 61225 involved "the attempted murder and aggravated battery of William Cullens that took

---

[1] Deputy Dunn testified that Bishop stated his name was "Balagoon Sankofa," which is a known alias of Bishop and which appears on the charging information. Transcript at 454.

place on August 31, 2012 (at around 10:50 pm) . . . ." Appellant's Appendix at 54. The State argued that ".45 caliber shell casings [were] recovered from each scene" and Firearms and Toolmarks Examiner Timothy Spears determined that they "were in fact fired from the same weapon" and "of the same manufactured brand . . . ." *Id.* at 55. The State further argued that the three separate shooting incidents were committed over a ten-hour period, were of the same or similar character, and were geographically close in proximity. On January 7, 2013, Bishop filed a notice of objection to the State's request for joinder, and the court denied the State's motion the following day.

[10] On November 8, 2013, in Cause No. 61989, the case involving the shootings of Shana Ford-Gogoua and Zackery Joseph, the State filed a Notice of Intent to Offer Evidence Pursuant to Ind. Evidence Rule 404(b) and Request for Hearing to Address Admissibility of Evidence (the "Rule 404(b) Motion") in which it stated that it intended to present evidence regarding the murder of Shabazz and the attempted murder of Cullens using "the same .45 caliber handgun" and that such evidence is "essential and relevant to proving the identity of [Bishop] as the same person who attempted to murder Ms. Ford-Gogua and Mr. Joseph . . . ." *Id.* at 250-251. On November 19, 2013, Bishop filed his response arguing that the crimes were not sufficiently similar to earmark them as one person's handiwork. The Rule 404(b) Motion was incorporated into the record in the instant case.

[11] On February 11, 2014, Bishop filed a motion to suppress the statements of Shabazz identifying him as the person that shot him and argued that the

statements were inadmissible because they did not qualify as dying declarations and were testimonial and therefore admission would violate his Sixth Amendment right of confrontation. Also, on February 27, 2014, Bishop filed a Motion to Dismiss Due to Destruction of Evidence or in the Alternative for Exclusion of Evidence stating that he had been notified by the State on January 30, 2014, that the shell casings recovered from the scene of the attempted murder of Cullens were mistakenly destroyed by order of the responding officer following the completion of the firearms report prepared by Spears. The State filed its response to the motion to dismiss on March 4, 2014, and its response to the motion to suppress on March 7, 2014. Following evidentiary hearings on the three motions, on May 5, 2014, the court entered an order denying Bishop's motion to suppress, and granting the State's motion "to allow 404(b) evidence . . . as it relates to the identification of [Bishop] and the recovery of ballistics information . . . ." *Id.* at 160.

[12] The court commenced a jury trial on August 4, 2014, in which evidence consistent with the foregoing was presented. During the trial, Bishop renewed his objection to testimony relating to statements made by Shabazz to Sergeant Maloney and Detective Prater that he was shot by Zimbabwe on the same grounds as raised in his motion to suppress, and the court overruled each of his objections and admitted the statements as dying declarations.

[13] The State called Angela Allen, a friend of Bishop's for about twenty years, who testified that on August 31, 2012, she and Bishop went to the bank and that Bishop wanted her to keep some money for him, which is something she had

previously done for him, and that Bishop gave her $300 and stated that "he was going to, uh, go find Will or talk to Will . . . ." Transcript at 513. She testified that she had previously met a person known as "Big Will" through Bishop. *Id.* at 511. She further testified that Bishop "just showed up" at her house on September 1, 2012, at about 8:00 a.m., which she thought was unusual because he had never come without calling beforehand. *Id.* at 514. At this time, Bishop objected and renewed his argument that evidence relating to the Cullens shooting should not be admitted under Ind. Evidence Rule 404(b), and the court overruled the objection. Allen then testified that she had been trying to reach Bishop and asked where he had been, and he responded: "You don't want to know." *Id.* at 524. She indicated that she gave him his money and he left.

[14] The State also called William Cullens, again Bishop renewed his objection under Ind. Evidence Rule 404(b), and the court overruled his objection. Cullens testified that he had been a friend of Bishop for five years and they would see each other a few times a month. He testified that earlier in the summer of 2012 he borrowed $500 from Bishop, that they had agreed he would repay Bishop after receiving proceeds from an annuity settlement which was being structured in court, and that the payment had been delayed because the court had granted multiple continuances.

[15] Cullens indicated that, as of August 31, 2012, he had not received the payment and had not paid Bishop back on the loan, and on that evening he was at his home on Wind Drift Drive in Indianapolis with his girlfriend Yvonne Johnson.

That night, Yvonne asked him to drive her to a night club not far from their house because she did not want to drive herself, and around 11:00 p.m. they left to do so. Cullens testified that as the two were leaving the house and walking towards his vehicle, he heard a voice say: "Will, where's my money?" *Id.* at 634. He stated that he turned toward the sound of the voice and observed Bishop standing fifteen feet away and holding a gun, that he saw Bishop raise the gun at him, and Cullen turned and ran in the opposite direction. Cullens heard a gunshot and felt the shot enter his back under the shoulder blade, but he was able to keep running. He testified that he ran past the entrance to the apartments, stopped to dial 911, and told the operator that Zimbabwe, referring to Bishop, had shot him. He also stated that he told a responding officer and a detective at the hospital that Zimbabwe shot him. In response to a juror's question, Cullen also testified that he did not know Khalfani Shabazz.

[16] The State next called IMPD Detective Harry Dunn, the lead investigator into the Cullens shooting. Detective Dunn testified that he interviewed Cullens at the hospital, that Cullens told him he had been shot by a man named Zimbabwe, and that upon researching the name he found one person who used Zimbabwe as an alias and that person was Bishop. He indicated that based thereon, he put together a photo array which contained a picture of Bishop taken in 1991, and that Cullens identified the picture of Bishop as Zimbabwe. At this point, Bishop again renewed his objection on Rule 404(b) grounds, and the court overruled his objection and admitted the photo array as State's Exhibit 49. On cross-examination, Detective Dunn stated that at one point he

became aware that the shell casings from the Cullens shooting had been destroyed.

[17] Bishop also renewed his objection to the testimony of IMPD Evidence Technician Christopher Clouse, who testified that he collected the shell casings at the Cullens crime scene, on both Rule 404(b) grounds and on grounds that the evidence had been lost or destroyed, and the court overruled the objections and admitted the evidence of the shell casings. Bishop objected to the testimony of Spears, and again the court overruled the objection and admitted Spears's testimony, as well as photographs of the spent bullets. Spears testified consistent with his earlier report that he analyzed the shell casings and bullets recovered from both the Shabazz and Cullens crime scenes and that his tests concluded the casings and bullets were 45 caliber, were fired by the same gun, and were the same brand of bullet.

[18] On three different occasions, the court gave the jury a limiting instruction regarding the evidence related to the Cullens shooting that such evidence was admitted for the limited purpose of proving motive, knowledge, intent, or identity. During the court's first instance of giving this instruction, it specifically instructed the jury that "[y]ou may use the evidence on August 31st, if you wish, to determine the issue of the defendant's motive, his knowledge, his intent, and/or his identity for the issue on September 1," that "that is the only way you may use the information from the August 31st incident," that "you may not [] in any way [] determine that this is a character trait of the defendant," and that "the August 31st incident is for another jury, another court,

another day." *Id.* at 575-576.  The court instructed the jury to consider State's Exhibit 49 "for the limited purpose of motive, identity, knowledge or intent." *Id.* at 665.  Also, in Final Juror Instruction No. 5, the court instructed the jury:

> Sometimes evidence is admitted for a limited purpose.  You have heard testimony from multiple complaining witnesses.  You may consider the testimony of such witnesses as it relates to the other incidents for the limited purpose of determining the defendant's motive, intent, knowledge, and on the issue of identity.
>
> You may not consider such testimony for any other purpose.  Specifically, you may not consider the evidence as proof of the defendant's character. You may not draw any inference that, because the defendant acted in a certain way on one occasion, he must have acted the same way on a different occasion because of that character trait.  Each incident must be viewed and considered on its own individual facts.

Appellant's Appendix at 222.

[19]     On August 6, 2014, the jury found Bishop guilty as charged.  On August 12, 2014, the court held a sentencing hearing and sentenced him to sixty-five years in the Department of Correction.

## *Discussion*

[20]     The issue is whether the court abused its discretion in admitting certain evidence.  Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion.  *Noojin v. State*, 730 N.E.2d 672, 676 (Ind. 2000).  We reverse only where the decision is clearly against the logic and effect of the facts and circumstances.  *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*.  Even if the trial court's decision was an abuse of

discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[21] Bishop challenges the court's decision to admit three separate pieces of evidence: (A) Shabazz's identification of Bishop as the person who shot him; (B) evidence of the similarity between the fired cartridge casings recovered from the Shabazz shooting crime scene and the Cullens shooting crime scene; and (C) the circumstances of the Cullens shooting pursuant to Ind. Evidence Rule 404(b). We address each of Bishop's challenges separately.

A. *Shabazz's Identification of Bishop*

[22] Bishop challenges the court's decision to admit certain statements made by Shabazz to Sergeant Maloney and Detective Prater identifying Zimbabwe, later determined to be Bishop, as the person who shot him. Bishop asserts in his brief that a dying declaration under the hearsay exception in Ind. Evidence Rule 804(b)(2), which is testimonial in nature, is subject to Confrontation Clause scrutiny under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), and its progeny, that the statements of Shabazz are testimonial and thus should not have been admitted, and that even if Shabazz's statements are judged to be nontestimonial or otherwise not subject to confrontation analysis, such statements do not fit within the dying declaration hearsay exception.

[23] We first discuss whether the court abused its discretion by admitting the statements of Shabazz as dying declarations. Bishop argues that the circumstances surrounding the statements of Shabazz reveal that Shabazz did

not believe his death was imminent and had not abandoned all hope of recovery, and accordingly the hearsay exception does not apply. Specifically, Bishop asserts that Shabazz was assured by paramedics that he was going to be okay, noting that "[p]aramedics are skilled in life-saving, and persons with no medical background would rightly give much weight to what they say." Appellant's Brief at 20. He argues that "[a]lthough Shabazz's blood pressure was low, his heart rate, respiration rate, and oxygen levels were all normal," and that "he scored the maximum on the Glasgow Coma Score, which measures alertness to person, place, and thing." *Id.* at 19.

[24] The State argues that the evidence reveals that Shabazz believed his death to be imminent, noting that he asked Paramedic Johnson multiple times if he was going to die, which demonstrates "that the prospect of death was at the center of his thoughts." Appellee's Brief at 21. The State notes that Shabazz exhibited shortness of breath and difficulty breathing and that his body began to "compensate" in order to survive. *Id.* It asserts that "Shabazz's queries were perfectly consistent with the objective medical reality" that he had suffered multiple gunshot wounds and was bleeding, and it argues that the fact Johnson told him he would not die does not refute the conclusion that Shabazz believed his death was imminent, underscoring that he made the inquiry multiple times. *Id.*

[25] Out-of-court statements offered in court for the truth of the matter asserted are generally inadmissible hearsay. Ind. Evidence Rule 802. However, one among many exceptions to the inadmissibility of hearsay is an out-of-court statement

that is "[a] statement that the declarant, while believing the declarant's death to be imminent, made about its cause or circumstances." Ind. Evidence Rule 804(b)(2). The admissibility of such a "dying declaration" is based on "the belief that persons making such statements are highly unlikely to lie." *Idaho v. Wright*, 497 U.S. 805, 820, 110 S. Ct. 3139, 3149 (1990).

[26] The crux of Bishop's challenge to the admissibility of Shabazz's statements as dying declarations centers on Paramedic Johnson telling him that "he was going to be okay," which she indicated at trial was not a reflection of her true thoughts but was an effort to try and comfort him. Transcript at 420. It is true that, to be admissible as a dying declaration, the statement "must be made by a person who knew death was imminent and had abandoned all hope of recovery," but

> [i]n order to determine if a declarant made statements with the belief that death was imminent while having abandoned all hope of recovery, the trial court may consider the general statements, conduct, manner, symptoms, and condition of the declarant, which flow as the reasonable and natural results from the extent and character of his wound, or state of his illness.

*Wright v. State*, 916 N.E.2d 269, 275 (Ind. Ct. App. 2009) (quotations omitted), *trans. denied*.

[27] Here, we find that the court acted within its discretion when it concluded that Shabazz's statements were admissible dying declarations. Shabazz had been shot five times, inflicting wounds to the top of his head, his left arm, his left shoulder, the right side of his chest, and his third right finger, nearly amputating

the finger. The shot to his chest caused serious damage to his body, including two fractured two ribs, a huge tear to his liver approximately eight inches long, holes in his diaphragm, damage to his hepatic vein, a hole in his right lung, as well as tremendous bleeding. During surgery the doctors applied eleven gauze sponges to the wound, each of which is capable of holding a cup to a cup and a half of blood, which, combined with the blood found in the abdomen and right chest cavity, amounted to about four and a half liters of blood loss. Also, when Dunlap and Armbruster came upon Shabazz while riding their bikes, they heard him yelling "[o]h my God, oh my God," and "help." Transcript at 283. Paramedics at the scene observed that Shabazz was sweating profusely and administered oxygen using a nano-breather, and he was trying to catch his breath and unable to speak in complete sentences. Johnson believed Shabazz was in shock and required immediate transport to the hospital. In the ambulance, she noticed that Shabazz was starting to "compensate," which meant that his blood was collecting in and around the areas of his major organs in order to keep him alive. *Id.* at 418. Shabazz had no blood pressure, and the paramedics administered two of their largest IVs in an attempt to raise his blood pressure, but they were not very successful at doing so. Shabazz asked paramedics on multiple occasions if he was going to die despite assurances that "he was going to be okay." *Id.* at 420. He died at 1:41 p.m., which was within hours of his transport to the hospital. In light of his statements, conduct, manner, symptoms, and condition, as well as the reasonable and natural results from the extent and character of his extensive wounds, the trial court properly concluded that Shabazz's statements were admissible dying declarations.

Having determined that statements were properly adjudged to be dying declarations and admissible under Ind. Evidence Rule 804(b)(2), we next address Bishop's challenge under the Confrontation Clause of the Sixth Amendment. First, we note that in the landmark case of *Crawford v. Washington*, the United States Supreme Court held that "testimonial statements of a witness who did not appear at trial" are inadmissible "unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54, 124 S. Ct. at 1365. In a footnote, the Court acknowledged that a historical exception to the right of confrontation "involves dying declarations," specifically noting that "[t]he existence of that exception as a general rule of criminal hearsay law cannot be disputed" and that "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." *Id.* at 56 n.6, 124 S. Ct. at 1367 n.6. The Court reserved the question of whether the Sixth Amendment incorporated "an exception for testimonial dying declarations" and stated that such exception would be "*sui generis*."[2] *Id.*, 124 S. Ct. at 1367 n.6. Four years later, the Court examined the limited exceptions to a defendant's right of confrontation and observed that *Crawford* stands for the proposition "that the Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the

---

[2] *Sui generis* is Latin for "of its own kind" and means "[o]f its own kind or class; unique or peculiar." BLACK'S LAW DICTIONARY 1662 (10th ed. 2014).

founding.'" *Giles v. California*, 554 U.S. 353, 358, 128 S. Ct. 2678, 2682 (2008) (quoting *Crawford*, 541 U.S. at 54, 124 S. Ct. at 1354). The Court noted that it had "previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted" and that "[t]he first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying."[3] *Id.*, 128 S. Ct. at 2682.

[29] The Court's statements in *Giles* have been accepted as providing an exception to a defendant's right of confrontation for dying declarations in other jurisdictions. Recently, the Court of Appeals of Maryland, its highest court, joined the chorus of jurisdictions that have formally held that the Confrontation Clause does not apply to dying declarations. *Hailes v. State*, 113 A.3d 608, 621 (Md. 2015). The Maryland court discussed the relevant provisions of *Crawford* and *Giles* discussed above and further noted that those cases "were not the first cases in which the Supreme Court indicated that the Confrontation Clause does not apply to dying declarations," observing that

> [f]or example, in *Maryland v. Craig*, 497 U.S. 836, 847-48, 110 S. Ct. 3157, 111 L.Ed.2d 666 (1990), the Supreme Court stated:
>
> > We have repeatedly held that the [Confrontation] Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial. *See, e.g.*, *Mattox* [*v. United States*, 156 U.S. 237, 243, 15 S. Ct. 337 (1895)] ("[T]here could

---

[3] The Court termed the second exception, the scope of which was at issue in the case, as "forfeiture by wrongdoing," which "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles*, 554 U.S. at 359, 128 S. Ct. at 2683.

be nothing more directly contrary to the letter of the [Confrontation Clause] than the admission of dying declarations"[4]); *Pointer v. Texas*, 380 U.S. 400, 407, 85 S. Ct. 1065, 13 L.Ed.2d 923 (1965) (noting exceptions to the confrontation right for dying declarations and "other analogous situations").

Similarly, in *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S. Ct. 330, 78 L.Ed. 674 (1934), the Supreme Court stated that the Confrontation Clause has not

> at any time been without recognized exceptions, as, for instance, dying declarations. *Dowdell v. United States*, 221 U.S. 325, 330, 31 S. Ct. 590, 55 L.Ed. 753 (1911) ("Dying declarations, although not made in the presence of the accused, are uniformly recognized as competent [evidence]." (Citing *Mattox* [], 156 U.S. at 243-44, 15 S. Ct. 337)). *Cf. Robertson v. Baldwin*, 165 U.S. 275, 282 17 S. Ct. 326, 41 L.Ed. 715 (1897) (The Confrontation Clause does not "prevent the admission of dying declarations[.]"); *Motes v. United States*, 178 U.S. 458, 472, 473 20 S. Ct. 993, 44 L.Ed. 1150 (1900)[5].

(Italics added). Likewise, in *Kirby v. United States*, 174 U.S. 47, 61, 19 S. Ct. 574, 43 L.Ed. 890 (1899), the Supreme Court stated: "[T]he admission of dying declarations is an exception [to the Confrontation Clause] which arises from the necessity of the cause. **This exception was well established before the adoption of the [C]onstitution, and was not intended to be abrogated.**" (Emphasis added).

---

[4] In *Mattox* [], 156 U.S. at 243-44, 15 S. Ct. 337 the Supreme Court continued:

> [Y]et from time immemorial[, dying declarations] have been treated as competent [evidence], and no one would have the hardihood at this day to question their admissibility. They are admitted, not in conformity with any general rule regarding the admission of [evidence], but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice.

[5] In *Motes*, 178 U.S. at 472, 20 S. Ct. 993 the Supreme Court actually referred to statements that fall under the "forfeiture by wrongdoing" exception to the rule against hearsay, not dying declarations.

113 A.3d at 619-620 (some brackets omitted). The court stated that, as highlighted by the U.S. Supreme Court in *Kirby*, "the Confrontation Clause does not apply to dying declarations" because they "were an exception to the common law right of confrontation when the Sixth Amendment was ratified," and further observed that "[t]his accords with *Crawford* and its progeny, in which the Supreme Court has held that the Confrontation Clause applies to testimonial statements of types as to which—in contrast to dying declarations—there was no exception to the common law right of confrontation when the Sixth Amendment was ratified." *Id.* at 620-621 (citing *Crawford*, 541 U.S. at 40, 68, 124 S. Ct. 1354 (statements against penal interest); *Giles*, 554 U.S. at 357, 359, 377, 128 S. Ct. 2678 ("forfeiture by wrongdoing" under California law); *Davis v. Washington*, 547 U.S. 813, 819, 821, 834, 126 S. Ct. 2266 (2006) (excited utterances); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S. Ct. 2527 (2009) (purported business records and public records). The court held that the victim's identification of defendant Hailes was a dying declaration, that "thus, the Confrontation Clause does not apply," and that accordingly "we need not, and do not, address whether [the victim's] identification of Hailes was testimonial or non-testimonial, as the distinction is irrelevant in the context of dying declarations." *Id.* at 623.

[30] In the same matter, the Court of Special Appeals of Maryland, as affirmed by the Maryland Court of Appeals, provided a thorough recitation of what it termed a "juggernaut of persuasive authority" for excepting dying declarations from *Crawford* as follows:

Sixteen of our sister states have considered whether the Dying Declaration is exempted from the coverage of the Confrontation Clause. Sixteen out of sixteen have concluded that it is. In *People v. Monterroso*, 34 Cal. 4th 743, 765, 22 Cal. Rptr. 3d 1, 101 P.3d 956, 972 (2004), the California Supreme Court addressed the issue squarely:

> Thus, if, as *Crawford* teaches, the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding," it follows that *the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment*.

(Emphasis supplied). *See also Walton v. State*, 278 Ga. 432, 603 S.E.2d 263, 265-66 (2004); *People v. Gilmore*, 356 Ill. App. 3d 1023, 293 Ill. Dec. 323, 828 N.E.2d 293, 302 (2005) ("Although the statement just quoted [from *Crawford*] is *dicta*, we view it as a strong indication that the Court does not believe that admitting testimonial dying declarations violates the confrontation clause."); *Wallace v. State*, 836 N.E.2d 985, 996 (Ind. [Ct.] App. 2005) ("[W]e are convinced that *Crawford* neither explicitly, nor implicitly, signaled that the dying declaration exception to hearsay ran afoul of an accused's right of confrontation under the Sixth Amendment.")[, *trans. denied*]; *State v. Jones*, 287 Kan. 559, 197 P.3d 815, 822 (2008) ("Accordingly, we are confident that, when given the opportunity to do so, the Supreme Court would affirm that a dying declaration may be admitted into evidence, even when it is testimonial in nature and is unconfronted."); *Commonwealth v. Nesbitt*, 452 Mass. 236, 892 N.E.2d 299, 310-11 (2008) ("Thus, in the unique instance of dying declarations, we ask only whether the statement is admissible as a common-law dying declaration, and not whether the statement is testimonial."); *People v. Taylor*, 275 Mich. App. 177, 737 N.W.2d 790, 795 (2007) ("For the reasons stated by the Supreme Court of California, we hold that, under *Crawford*, dying declarations are admissible as an historic exception to the Confrontation Clause."); *State v. Martin*, 695 N.W.2d 578, 585-86 (Minn. 2005) ("We hold that the admission into evidence of a dying declaration does not violate a defendant's Sixth Amendment right to confrontation within the meaning of *Crawford* because an exception for dying declarations existed at common law and was not repudiated by the Sixth Amendment."); *Grindle v. State*, 134 So.3d 330, 341-44 (Miss. App. 2013) ( "[W]e are swayed by the United States Supreme Court's

commentary in *Crawford* and *Giles* that, were the matter properly before the Court, the exception would be held to apply."); *Harkins v. State*, 122 Nev. 974, 143 P.3d 706, 711 (2006) ("The Confrontation Clause, like other provisions in the Bill of Rights, is subject to exceptions, 'recognized long before the adoption of the Constitution, and not interfering at all with its spirit.' A dying declaration is one such exception to the Confrontation Clause."); *People v. Clay*, 88 A.D.3d 14, 26-27, 926 N.Y.S.2d 598 (N.Y. App. Div. 2011) ("Thus, we read *Crawford* to signify that the substance of the right of confrontation enshrined in the Constitution is informed by the contemporaneous understanding of that right at common law, and is not, instead, an abrogation of it. We therefore conclude that the Supreme Court, having suggested that the common-law right did not encompass dying declarations, would likely determine that the same is true of the Sixth Amendment."); *State v. Calhoun*, 189 N.C. App. 166, 657 S.E.2d 424, 428 (2008) ("We ... follow the majority of the states that have decided this issue and hold that a dying declaration is a 'special exception' under *Crawford* to the Sixth Amendment right to confrontation."); *State v. Kennedy*, 998 N.E.2d 1189, 1202 (Ohio Ct. App. 2013) ("In light of this case law, we hold that the Sixth Amendment incorporates an exception for 'the common law pedigree' of dying declarations, even testimonial ones, and that *Crawford* did not alter the rule."); *State v. Lewis*, 235 S.W.3d 136, 148 (Tenn. 2007) ("Because the admissibility of the dying declaration is also deeply entrenched in the legal history of this state, it is also our view that the single hearsay exception survives the mandate of *Crawford* regardless of its testimonial nature."); *Satterwhite v. Commonwealth*, 56 Va. App. 557, 695 S.E.2d 555, 560 (2010) ("[W]e hold *Crawford* did not upend the traditional view that dying declarations serve as an exception both to the common law hearsay rule and the constitutional right of a defendant to confront his accusers."); *State v. Beauchamp*, 333 Wis. 2d 1, 796 N.W.2d 780, 784-85 (2011) ("Those principles compel the conclusion that allowing this hearsay exception comports with the protections of the Confrontation Clause."). *Contra United States v. Mayhew*, 380 F.Supp.2d 961, 964-65 (S.D. Ohio 2005) (*Mayhew* admitted the dying declaration but rationalized the exemption from the Confrontation Clause as an instance of forfeiture by wrongdoing.).

The academic authorities are in solid accord. [2] MᴄCᴏʀᴍɪᴄᴋ ᴏɴ Eᴠɪᴅᴇɴᴄᴇ,[§ 309, at 507-508 (7th ed. 2013)], stated:

> The fact that dying declarations were received at the time the Constitution and the Bill of Rights were formed when the hearsay rule was not yet settled led the Supreme Court in *Crawford v. Washington* to suggest that *even if such a statement is testimonial it would be admissible as an exception to the Confrontation Clause objection.*

(Emphasis supplied).

[6A LYNN] MCLAIN, MARYLAND EVIDENCE: STATE AND FEDERAL, § 804(3):1b, at 771 [(3d ed. 2013)], observed . . . :

> In *Crawford v. Washington* the U.S. Supreme Court opined that *although some dying declarations might be "testimonial"* for purposes of the confrontation clause, *they would nonetheless be admissible against a criminal accused.*

(Emphasis supplied).

Professor [Peter Nicholas, *"I'm Dying to Tell You What Happened": The Admissibility of Testimonial Dying Declarations Post-*Crawford, 37 HASTINGS CONST. L.Q. 487, 491-492 (2010)], observed in that regard:

> In footnote six, the Court took pains to point out that *Crawford* did not technically decide the issue of the admissibility of dying declarations vis-à-vis the Confrontation Clause. But if the post-*Crawford* era to date is any guide, *this dictum will, like other dicta in Crawford, soon become the Law of the Land. ...* In any event, the Court's holding in *Giles v. California four years later effectively assumes that a dying declaration exception to the Confrontation Clause exists.* Moreover, lower federal courts and state courts that have addressed the issue have, with near unanimity, read footnote six of *Crawford* as creating a dying declaration exception to the Confrontation Clause.

(Emphasis supplied).

Professors [Tim Donaldson and J. Preston Frederickson, *Dying to Testify? Confrontation vs. Declaration In Extremis*, 22 REGENT U.L. REV. 35, 77 (2010)], have also noted:

> *Crawford* acknowledged the existence of authority for admitting testimonial dying declarations. *The Supreme Court left no doubt in Giles about its understanding of the status of the dying declaration exception* at the time of founding when it confirmed: "We have

previously acknowledged that *two forms of testimonial statements were admitted at common law even though they were unconfronted … The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying*." There is no foundation for the assertion that the dying declaration exception was nonexistent at the time that the Bill of Rights was designed.

… Whatever construction a court places on the Confrontation Clause, it is irrefutable that dying declarations were admitted at common law before and after ratification of the Bill of Rights. *If something must yield when reconciling theory and history in this area, the permanence of history should withstand the winds of changing thought.*

(Emphasis supplied).

*State v. Hailes*, 92 A.3d 544, 565-567 (Md. Ct. Spec. App. 2014), *aff'd*, 113 A.3d 608 (2015).

[31] The Court of Special Appeals opinion in *Hailes* cited this court's decision in *Wallace v. State*, which observed that defendant Wallace cited *Crawford* without further argument and inferred that Wallace was challenging the admissibility of statements made by the decedent as dying declarations as a violation of his right of confrontation. 836 N.E.2d at 996. The court disagreed and noted "that *Crawford* neither explicitly, nor impliedly, signaled that the dying declaration exception to hearsay ran afoul of an accused right of confrontation under the Sixth Amendment." *Id.* Then, in *Wright*, defendant Wright conceded, as the court noted approvingly, "that the rule in *Crawford* has a well-recognized exception for dying declarations." 916 N.E.2d at 275. Today, we formally recognize that dying declarations as provided by Ind. Evidence Rule 804(b)(2)

are excepted from the right of confrontation provided by the Sixth Amendment. Accordingly, we need not decide whether the statements of Shabazz were testimonial in nature. The court did not abuse its discretion in admitting such statements.[6]

B. *Cartridge Casings*

[32] Bishop challenges the trial court's decision to admit the testimony of Spears that the casings recovered from the Cullens scene were fired from the same gun as was used in the murder of Shabazz because the casings from the Cullens scene were mistakenly destroyed by the State. He argues specifically that "there was some indication that the casings possessed an exculpatory value that, however tenuous, was evident to the State prior to its destruction." Appellant's Brief at 26.

[33] A defendant's due process rights are violated when the State fails to disclose or preserve material exculpatory evidence. *See United States v. Agurs*, 427 U.S. 97 (1976). For evidence to be constitutionally material, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). When the evidence at issue is material exculpatory

---

[6] The State also suggests in its brief that the statements of Shabazz were admissible as excited utterances under Ind. Evidence Rule 803(2). However, because we conclude that the statements were admissible as dying declarations, we need not address the State's argument.

evidence, it is irrelevant whether the State's failure to disclose or preserve the evidence was in good or bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

[34] In contrast, when the evidence at issue is "potentially useful evidence," as opposed to material exculpatory evidence, failure to preserve that evidence does not amount to a due process violation "unless a criminal defendant can show bad faith" on the State's behalf. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), *reh'g denied*. Evidence that is "potentially useful" was described by the Supreme Court as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. At the heart of the *Youngblood* decision was the Court's unwillingness to impose under the Due Process Clause "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58.

[35] Here, Bishop does not assert that the State acted in bad faith and argues simply that loss of the shell casings is significant because it deprived him of the opportunity to test the casings and contradict the State's expert testimony that the casings came from the same firearm. We find, however, that it is clear the destroyed shell casings fall under the category of "potentially useful evidence" because they did not have "exculpatory value that was apparent before the evidence was destroyed." *Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534. Indeed, Bishop concedes that their significance is contingent upon the chance that additional testing would yield a result inconsistent with that of the State's expert (i.e., potentially useful), and therefore his due process argument must fail

without a showing of bad faith. We conclude that the court did not abuse its discretion by allowing the State to present expert testimony regarding the casings.

## C. *Cullens Shooting*

[36] Bishop contends that the court abused its discretion in admitting evidence of the Cullens shooting under Ind. Evidence Rule 404(b) because the circumstances of the Cullens shooting and the Shabazz shooting do not share enough similarity for the Cullens shooting to be used as evidence of Bishop's identity. He argues that to qualify under the rule "the crimes must be so strikingly similar that it can be said with 'reasonable certainty' that the same person committed them" and that the circumstances of the two crimes do not meet that threshold. Appellant's Brief at 28. Bishop argues that "[t]he only relevance the Cullens case had to the Shabazz case was to show that Bishop shot Cullens, so he probably shot Shabazz," that "[t]his is the 'forbidden inference' precluded by Evid. Rule. 404(b)," and that even if it had relevance outside of Bishop's propensity to commit crimes the evidence should have been excluded under Ind. Evidence Rule 403. *Id.* at 32. He further asserts that the admission of such evidence was not harmless, noting that although the court admonished the jury that evidence of the Cullens shooting could only be used on the issue of knowledge, intent, identity, and motive, "this admonishment could not remove the taint of the facts of the Cullens case. The jury's apparent decision to believe Shabazz's identification of Bishop as his shooter may have turned on the

wrongly admitted evidence and caused it to decide the case based on Bishop's propensity to commit crimes." *Id.* at 34.

[37] The State argues that the evidence of the Cullens shooting demonstrated that the same firearm used to shoot Cullens was used to shoot Shabazz. It asserts that such evidence was probative as to Bishop's motive, noting that both shootings occurred during the same twenty-four hour period and involved financial disputes. The State asserts that it had the burden of proving identity and in that regard "had relevant evidence [of] another shooting, in the same 24-hour period, involving the same firearm, same caliber weapon, evincing the same intent . . . to find people who owed him money, and evidencing the same motive for shooting his victims," and that the probative weight of such evidence was greater than its prejudice. Appellee's Brief at 40. The State further contends that, even if admitting such evidence was error, any error was harmless at most because the court "insulated the jury from its misuse with prophylactic jury instructions" and "the law presumes that the jury will follow the trial court's admonition" which "cures any error in the admission of evidence." *Id.* at 41.

[38] Ind. Evidence Rule 404(b), titled "Crimes, Wrongs, or Other Acts," states:

> (1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses; Notice in a Criminal Case*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

lack of accident. On request by a defendant in a criminal case, the prosecutor must:

> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

> (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

[39] Rule 404(b) "was designed to assure that 'the State, relying upon evidence of uncharged misconduct, may not punish a person for his character.'" *Lee v. State*, 689 N.E.2d 435, 439 (Ind. 1997) (quoting *Wickizer v. State*, 626 N.E.2d 795, 797 (Ind. 1993) (citing *Lannan v. State*, 600 N.E.2d 1334, 1338 (Ind. 1992))), *reh'g denied*. The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Boone v. State*, 728 N.E.2d 135, 137-138 (Ind. 2000), *reh'g denied*; *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997). "To determine whether the trial court abused its discretion, we employ the same test." *Wilhelmus v. State*, 824 N.E.2d 405, 414 (Ind. Ct. App. 2005) (quoting *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004)).

[40] The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct. *Crain v. State*, 736 N.E.2d 1223, 1235 (Ind. 2000). The trial court

has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission. *Id.* If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence. *Boone*, 728 N.E.2d at 138.

[41] Evidence of other crimes admitted under the identity exception are generally evaluated based upon whether such crimes are "'signature' crimes with a common modus operandi." *Thompson v. State*, 690 N.E.2d 224, 234 (Ind. 1997). The rationale behind this exception "is that the crimes, or means used to commit them, were so similar and unique that it is highly probable that the same person committed all of them." *Id.* (citing *Lockhart v. State*, 609 N.E.2d 1093, 1097 (Ind. 1993)). While the "signature crime" test focuses on similarity and uniqueness between the charged and uncharged conduct, we note that in addition courts have long considered "whether or not the evidence is so specifically and significantly related to the charged crime in time, place and circumstance as to be logically relevant to one of the particular excepted purposes." *Malone v. State*, 441 N.E.2d 1339, 1346 (Ind. 1982) (citing *Montgomery v. State*, 274 Ind. 544, 548, 412 N.E.2d 793, 795 (1980), *reh'g denied*; *Duvose v. State*, 257 Ind. 450, 451, 275 N.E.2d 536, 537 (1971)). Both "the timing and similarity of the incidents are factors in the larger inquiry into whether the incidents were relevant to a matter in issue." *Hicks*, 690 N.E.2d at 222.

[42]     Here, the evidence elicited by the State related to the Cullens shooting included that Angela Allen saw Bishop on the evening of August 31, 2012, the night before Shabazz was discovered shot at his home, and that Bishop gave her $300 and stated that "he was going to, uh, go find Will or talk to Will," whom she knew through Bishop. Transcript at 513. Bishop showed up at about 8:00 a.m. on the morning of September 1, 2012, and when asked where he had been he responded: "You don't want to know." *Id.* at 524. Allen gave Bishop his money and he left. Cullens testified that he owed Bishop $500 and on August 31, 2012, at about 11:00 p.m., he encountered Bishop outside of his home as he was walking to his car. Bishop asked "Will, where's my money?" and Cullens observed Bishop holding a gun. *Id.* at 634. Bishop raised the gun, Cullens ran in the opposite direction, Bishop shot Cullens, but Cullens was able to keep running and call 911. Cullens told a responding officer that he had been shot by Zimbabwe. Detective Dunn testified that Cullens identified Bishop as Zimbabwe, the same alias provided by Shabazz to detectives. Spears testified that shell casings and bullets recovered from both the Cullens and Shabazz crime scenes were fired from the same 45 caliber handgun and were the same brand of bullet.

[43]     We find that this evidence was relevant to the identity and motive of Bishop as the person who shot Shabazz, and was not merely evidence supporting the "forbidden inference" of Bishop's propensity to commit the charged act, because the time, place, and circumstances of the Cullens shooting are logically relevant to those excepted purposes under Ind. Evidence Rule 404(b). The

Cullens shooting occurred within hours of the shooting of Shabazz during the same overnight period. Both shootings occurred in the city of Indianapolis. Also, the evidence revealed that both shootings concerned financial disputes between Bishop and the victims. Importantly, there is strong circumstantial evidence linking the shootings in that shell casings and bullets recovered from the Cullens shooting, in which Cullens identified Bishop as the shooter, matched shell casings and bullets recovered from the Shabazz crime scene as being fired from the same gun and were the same brand of bullet. The probative value of such evidence vastly outweighed any prejudicial effect it might have had on Bishop.

[44] To the extent Bishop suggests that the evidence from the Cullens shooting was inadmissible under Ind. Evidence Rule 404(b) because it did not rise to the level of a "signature crime," we note that our precedent takes care to note that "[t]he identity exception to the general prohibition on propensity evidence is crafted *primarily* for 'signature' crimes with a common modus operandi." *Thompson*, 690 N.E.2d at 234 (emphasis added). The test for whether identity evidence constitutes a signature crime does not focus on the timeframe between the different criminal episodes. *See, e.g.*, *Nicholson v. State*, 963 N.E.2d 1096, 1098-1100 (Ind. 2012) (holding that evidence of a prior conviction and surrounding circumstances stemming from conduct occurring twenty-two months prior to the instant crime was admissible under Ind. Evidence Rule 404(b) as evidence of a signature crime). It is for this reason that our precedent has set a high bar for admitting signature crime evidence, focusing instead on whether the crimes

are "so strikingly similar that one can say with reasonable certainty that one and the same person committed them." *Davis v. State*, 598 N.E.2d 1041, 1048 n.2 (Ind. 1992), *reh'g denied*, *cert. denied*, 510 U.S. 948, 114 S. Ct. 392 (1993). In this case, the evidence of the Cullens shooting was relevant to show Bishop's identity based upon the closeness in time (during the same evening), place (the city of Indianapolis), and circumstance (financial disputes between Bishop and both Cullens and Shabazz, and the same firearm was used in each shooting).

[45] We conclude that based upon the closeness in time, place, and circumstances, of the two shootings, including the forensic evidence showing that the same firearm was used at each shooting within hours of each other, the evidence presented of the Cullens shooting was relevant, and its probative value outweighed any prejudice to Bishop. The court did not abuse its discretion in admitting this evidence.

### Conclusion

[46] For the foregoing reasons, we affirm Bishop's conviction for murder.

[47] Affirmed.

Crone, J., and Pyle, J., concur.