## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 05 2019, 6:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Nicholas S. Gray,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 5, 2019

Court of Appeals Case No.
19A-CR-33

Appeal from the Madison Circuit Court

The Honorable Angela G. Warner Sims, Judge

Trial Court Cause No.
48C01-1609-MR-1939

**Mathias, Judge.**

[1]     Following a jury trial in Madison Circuit Court, Nicholas S. Gray ("Gray") was convicted of murder, Level 6 felony obstruction of justice, and Class A

misdemeanor attempted dealing in marijuana. The jury also found that Gray was an habitual offender and used a firearm during the commission of a crime. The trial court sentenced Gray to an aggregate term of ninety-eight years of incarceration. Gray appeals and presents four issues, which we restate as:

> I.      Whether the trial court abused its discretion when it denied Gray's motion to dismiss after the vehicle in which the murder occurred was sold at auction prior to trial;
>
> II.     Whether the trial court abused its discretion by excluding evidence regarding the character of an individual whom Gray claims attempted to rob him;
>
> III.    Whether the trial court abused its discretion by admitting evidence regarding a handgun found on Gray when he was arrested; and
>
> IV.     Whether Gray's ninety-eight-year sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

In the summer of 2016, Gray met the victim in this case, Jeremy Silvey ("Silvey"), through a mutual friend. The two men became friends and hung out with each other several times. On September 8, 2016, Silvey called his friend Kennley Johnson ("Johnson") and told him that Gray wanted to buy a pound of marijuana. Silvey knew Johnson was able to find marijuana at low prices, and Johnson considered himself to be a "middle man" between drug dealers and purchasers. Johnson agreed to help Silvey and Gray find marijuana for

sale. Johnson then found a supplier willing to sell a pound of marijuana and told Silvey to meet him at a café on 29th Street in Anderson, Indiana.

[4] Silvey drove to the meeting place with Gray where they picked up Johnson, who had never met Gray before. Johnson did not want to sit in the back seat, as Silvey's dog was in the back seat. Gray therefore sat in the back seat, with Johnson in the front passenger's seat, and Silvey driving. Johnson told Silvey to drive to a home on the west side of Anderson. When they reached their destination, Johnson told Silvey to park on the street near the house and let Johnson conduct the transaction, as the supplier would not let people he did not know into his house. Gray gave Johnson $700 to purchase the marijuana, and Johnson walked to the door of the house. The person who answered the door told Johnson that the drug supplier was not home. But instead of returning to the car and informing Silvey and Gray that his supplier was not home, Johnson decided to keep the money for himself. He therefore walked behind the supplier's house and left the area on foot.

[5] Unaware of this development, Silvey and Gray remained in the car, waiting for Johnson to return. Eventually, someone approached their car and asked them what they were doing. Gray told them that they were waiting for a friend, and the person told them, "If the person you're waiting for, um, the person that you're waiting on that went in is not coming back out. He went out through, through the back." Tr. Vol. 5, p. 15. Silvey then drove back to the café to look for Johnson. Unable to find Johnson there, Silvey drove to the east side of town, where Gray's apartment was located. Silvey drove to the "dead end" of

the parking lot of the Lynwood Village Apartment complex. Before Silvey put the car into park, Gray shot Silvey in the back of the head using a .357 magnum Taurus revolver ("the Taurus"), killing him.

[6] A witness in a nearby car heard the gunshot and saw Gray run from the car. Gray ran to his home, which was only a few minutes away, where he lived with his mother and his girlfriend. When he arrived home, Gray told his mother, "I think I just killed somebody," and claimed to have been robbed. Tr. Vol. 4, p. 164. The following morning, Gray's mother heard about Silvey's death and asked her son, "[h]ow do you feel on the inside of your soul?" *Id*. at 166. Gray told his mother that he "didn't care," and was "glad the motherf***er's dead." *Id*.

[7] Approximately one week after the shooting, Gray and his mother drove to Gary, Indiana. There, Gray traded his Taurus revolver for a black .32 caliber Smith and Wesson revolver ("the S&W"). Gray told the person with whom he traded the revolvers that "a friend of his tried to set him up and got him — to get him robbed. He set him up and robbed him. He set him up and robbed him, had him robbed. So he caught the friend and shot him." Tr. Vol. 5, p. 223.

[8] Eventually, the police began to suspect Gray in Silvey's death and, on September 15, 2016, obtained a warrant for his arrest. The police knocked on the door to Gray's home and announced that they had a warrant. Gray hid in the attic with his loaded revolver. Ultimately, the police apprehended Gray and

took him to the police station. After being read his *Miranda* rights, Gray spoke with the police and denied any involvement in Silvey's death.

[9] On September 20, 2016, the State charged Gray with murder. The State later added charges of Level 6 felony obstruction of justice and Class A misdemeanor attempted dealing in marijuana. The State also filed two enhancements, alleging that Gray used a firearm in the commission of a crime and that Gray was an habitual offender.

[10] In the meantime, on September 9, 2016, Silvey's car had been towed to Northwest Towing (Northwest") and stored in a secure area of the impound lot. The Anderson Police Department ("APD") had a contract with Northwest that allowed the police to store vehicles on Northwest's lot. After the vehicle was towed to the impound lot, APD Detective Doug Stanton ("Detective Stanton") examined it, taking photos of the vehicle, searching it for physical evidence, dusting it for fingerprints, and swabbing the door handles for DNA evidence. The APD placed a hold on the vehicle so that it would remain at the lot. Northwest's records, however, indicated that this hold was released on September 13, 2016. Still, after this date, the lead detective in the investigation into Silvey's death, Detective Norman Rayford ("Detective Rayford"), called Northwest several times to confirm that the vehicle was still being held, and Detective Rayford was unaware that the hold had been released and that Northwest attempted to, and eventually did sell, the vehicle. Specifically, Northwest sold the vehicle at an auction on November 6, 2017, at which point the charges against Gray had been pending for almost a year and a half.

[11] On February 14, 2018, Gray's counsel filed a motion to inspect the vehicle, unaware that it had already been sold. At a pre-trial hearing on February 26, 2018, the parties discussed Gray's motion and the fact that the car had been sold. Gray agreed that his motion to inspect was now "moot," but noted that he intended to investigate the circumstances of the vehicle's sale. Tr. Vol. 1, p. 32.

[12] On May 31, 2018, Gray filed a motion to dismiss, claiming that the State had intentionally or negligently "destroyed" evidence, i.e. Silvey's "2009 Toyota [C]orolla, the content's [sic] thereof, including potentially exculpatory forensic evidence." Appellant's App. Vol, 3, p. 32. Gray also claimed that the State acted in bad faith when destroying the evidence.

[13] The trial court held a hearing on Gray's motion to dismiss on June 1, 2018, at which Gray argued that Silvey's car could have contained exculpatory evidence that was now unavailable because the State permitted the car to be sold. The State presented the testimony of Detective Stanton, who explained that, once he had processed the car for evidence, he told Northwest that the vehicle could be released to its owner, and admitted that records indicated that he released the hold on the car on September 15, 2017. Detective Rayford testified that Northwest had contacted him asking for permission to release the vehicle and that he informed them that he could not do that until he spoke with the prosecutor's office and defense counsel. He was therefore unaware that the car had been sold. Specifically, he testified:

> A. . . . I made the decision after talking to [the] Deputy
> Prosecutor . . . to override the release if it was to maintain that

vehicle until the defense can or the Prosecutor could examine it if they chose to.

Q.     Did anyone contact Northwest and let them know –

A.     – I did, sir.

Q.     You did?

A.     To keep the hold on it, I did.

Q.     You told them to keep the hold on it?

A.     Yes I did.

Tr. Vol. 1, p. 98. After hearing arguments from both parties, the trial court took the matter under advisement and, on June 5, 2018, denied Gray's motion to dismiss.

[14]     A jury trial began on October 23, 2018. Gray's defense was that Johnson tried to rob him and that, during an ensuing struggle with Johnson in the car, the gun went off and accidentally struck Silvey. During the State's case-in-chief, Gary objected to the admission of evidence of the S&W handgun he traded for his Taurus handgun. During Gray's case-in-chief, he sought to admit evidence that Johnson was a violent person. The trial court excluded this evidence on grounds that it was impermissible character evidence. The jury found Gray guilty as charged and determined that he used a firearm in the commission of a crime and was an habitual offender.

[15]     The trial court held a sentencing hearing on November 26, 2018. The trial court found as aggravating: Gray's extensive criminal history; that he was on

probation at the time of the instant offenses; that he had pending charges for escape as a result of cutting off and removing his ankle monitor in another case; and that Gray killed Silvey in a brutal execution style. The court found no significant mitigators and sentenced Gray to sixty years on the murder conviction, a concurrent two and one-half years for the obstruction of justice conviction, and a concurrent year on the attempted dealing in marijuana conviction. The trial court also added twenty years to Gray's sentence for the firearm enhancement and an additional eighteen years for the habitual offender enhancement, for a total aggregate term of ninety-eight years of incarceration. Gray now appeals.

### I. Motion to Dismiss

Gray first argues that the trial court erred when it denied his motion to dismiss after Silvey's car was sold by the towing company. Gray argues that the State's failure to preserve this evidence was tantamount to destroying it, thereby denying him due process. We have explained before that:

> [a] defendant's due process rights are violated when the State fails to disclose or preserve material exculpatory evidence. *See United States v. Agurs*, 427 U.S. 97 (1976). For evidence to be constitutionally material, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). When the evidence at issue is material exculpatory evidence, it is irrelevant whether the State's failure to disclose or preserve the evidence was in good or bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004).

In contrast, when the evidence at issue is "potentially useful evidence," as opposed to material exculpatory evidence, failure to preserve that evidence does not amount to a due process violation "unless a criminal defendant can show bad faith" on the State's behalf. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), *reh'g denied*. Evidence that is "potentially useful" was described by the Supreme Court as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. At the heart of the *Youngblood* decision was the Court's unwillingness to impose under the Due Process Clause "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58.

*Bishop v. State*, 40 N.E.3d 935, 950 (Ind. Ct. App. 2015), *trans. denied*.

[17]     Although Gray claims that Silvey's car was material exculpatory evidence, his own argument undermines his position. That is, he claims that there could have been evidence of Johnson's fingerprints on the door handle that would have supported his claim that Johnson entered the car and tried to rob him. He also claims that whether the back door had child-proof locks would have been important evidence of whether Johnson could have opened the door.

[18]     None of this evidence, however, is materially exculpatory. "Exculpatory is defined as '[c]learing or tending to clear from alleged fault or guilt; excusing.'" *Land v. State*, 802 N.E.2d 45, 49–50 (Ind. Ct. App. 2004) (quoting *Wade v. State*, 718 N.E.2d 1162, 1166 (Ind. Ct. App. 1999)), *trans. denied*. There was no evidence gleaned from the automobile whose exculpatory value was apparent before the automobile was sold. Instead, any evidentiary value of the car was

merely "potentially useful" because it was "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 67; *see also Bishop*, 40 N.E.3d at 950 (holding that shell casings collected from the scene of the crime, which were later accidentally destroyed by the State, were not materially exculpatory evidence but instead merely potentially useful evidence because their significance was "contingent upon the chance that additional testing would yield a result inconsistent with that of the State's expert[.]").

[19] Accordingly, to show that the "destruction" of this evidence denied him due process, Gray must show that the State destroyed the evidence, i.e., allowed the car to be sold, in bad faith. Having based his argument on the proposition that the evidence from the car was materially exculpatory, Gray makes no such argument on appeal. But even if he did, he would not prevail, as the evidence in the record clearly shows that the lead detective in this case, Detective Rayford, repeatedly told the towing company to keep the car in storage despite the fact that Detective Stanton had released the hold on the car. The facts and circumstances surrounding the State's failure to preserve the car demonstrate, at most, negligence, not bad faith. *See Youngblood*, 488 U.S. at 67; *see also Bishop*, 40 N.E. 3d at 950.

## II. Exclusion of Evidence

[20] Gray next contends that the trial court erred by excluding evidence regarding Johnson's reputation for violence. Decisions regarding the admission or exclusion of evidence are entrusted to the sound discretion of the trial court.

*Laird v. State,* 103 N.E.3d 1171, 1175 (Ind. Ct. App. 2018), *trans. denied*. On appeal, we review the trial court's decision only for an abuse of that discretion. *Id.* The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.*

[21] Gray sought to admit testimony from two witnesses that Johnson had a reputation as being a violent drug dealer who should not be "crossed." Tr. Vol. 7, p. 96. Gray claims that this evidence would have shown that Johnson was "acting in accordance with his violent character[,] that he attacked [Gray] and buttress [Gray]'s claim that [he] was acting in self-defense when Silvey was killed." Appellant's Br. at 19. This sort of character evidence, however, is explicitly prohibited by the Indiana Rules of Evidence.

[22] Indiana Evidence Rule 404(a) provides:

> **(a) Character Evidence.**
>
>> (1) *Prohibited Uses*. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.
>>
>> (2) *Exceptions for a Defendant or Victim in a Criminal Case*. The following exceptions apply in a criminal case:
>>
>>> (A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;
>>>
>>> (B) subject to the limitations in Rule 412, a defendant may offer evidence of an alleged victim's pertinent trait, and if

the evidence is admitted, the prosecutor may offer evidence to rebut it; and

(C) in a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

(3) *Exceptions for a Witness*. Evidence of a witness's character may be admitted under Rules 607, 608, and 609.

[23] Here, Gray explicitly sought to admit evidence of Johnson's character or character trait (his reputation as a violent drug dealer) in order to prove that Johnson acted in accordance with this character on the night of the shooting. This is precisely the sort of evidence that is prohibited by Evidence Rule 404(a)(1). Moreover, none of the exceptions listed in Rule 404(a)(2) apply. Johnson is not the defendant, so the exception contained in Rule 404(a)(2)(A) is inapplicable; nor was Johnson the victim, so the exceptions in Rule 404(a)(2)(B) and 404(a)(2)(C) are inapplicable.

[24] Evidence Rule 404(a)(3) does provide that evidence of a witness's character may be admitted pursuant to Evidence Rules 607, 608, and 609. None of these Rules are applicable to Johnson. Rule 607 merely provides that any party, including the party that called the witness, may attack the witness's credibility. Rule 608 governs evidence regarding a witness's character for truthfulness, not whether the witness has a violent character. And Rule 609 controls when a witness's criminal conviction may be used to attack the witness's credibility. Here, Gray sought to admit evidence regarding Johnson's character as a violent

drug dealer; he did not seek to admit evidence of Johnson's prior convictions in order to attack his credibility. Thus, Evidence Rule 609 is inapposite.

[25] Gray argues that the exclusion of evidence regarding Johnson's character denied him the constitutional right to present a defense. Specifically, he claims that he should have been able to introduce evidence of Johnson's character because his theory of the defense was that Johnson attempted to rob him and Silvey was shot in the struggle. Gray claims that if Johnson had been shot instead of Silvey, then evidence of Johnson's violent character would have been admissible under Evidence Rule 404(a)(2)(B). Thus, he contends that evidence of Johnson's violent character should be equally admissible even though the shot that was fired struck Silvey instead of Johnson. *See* Appellant's Br. at 17 ("'Evidence that the injury causing death was inflicted accidentally on the deceased by the accused in justifiable self-defense against the attack of a third person is admissible, subject to any limitations that would apply if the third person had been killed.'") (quoting 41 C.J.S. Homicide § 423 (2019)).

[26] The problem with Gray's argument is that there was no evidence suggesting that he knew of Johnson's violent character. Johnson testified that he had never met Gray before the day of the shooting, Tr. Vol. 4, p. 86, and Gray himself testified that he had never met Johnson before and did not know who Johnson was. Tr. Vol. 6, p. 250. We have held that a victim's reputed character, propensity for violence, prior threats and acts, *if known by the defendant*, may be relevant to the issue of whether a defendant feared the victim *prior to utilizing deadly force against him*. *Welch v. State*, 828 N.E.2d 433, 437 (Ind. Ct. App. 2005)

(citing *Brand v. State*, 766 N.E.2d 772, 780 (Ind. Ct. App. 2002), *trans. denied*) (second emphasis added). Even though the victim's threats or violence need not be directed toward the defendant, "'the defendant must have knowledge of these matters at the time of the . . . confrontation between the victim and the defendant.'" *Id.* (quoting *Brand*, 766 N.E.2d at 780); *see also Holder v. State*, 571 N.E.2d 1250, 1254 (Ind. 1991) (holding that trial court did not deprive defendant of due process by excluding evidence of victim's prior acts of violence of which the defendant was not aware). Because Gray did not know Johnson before the night of the shooting, the trial court properly excluded evidence of Johnson's character.

[27] Even if the trial court erred by excluding this evidence, any error therein was harmless. Errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party, and we will not reverse a defendant's conviction if the error was harmless. *Harrison v. State*, 32 N.E.3d 240, 254 (Ind. Ct. App. 2015), *trans. denied*. An error is harmless if substantial independent evidence of guilt satisfies us that no substantial likelihood exists that the evidence at issue contributed to the conviction. *Id.*

[28] Gray admitted that he shot Silvey. The only question was whether he did so accidentally during a struggle with Johnson, as he claimed, or whether he did so knowingly or intentionally. The evidence overwhelmingly supports the latter theory. A witness saw Silvey pull his car into the parking lot and observed Silvey's dog in the passenger's seat and one person in the back seat. This witness saw no other person in the car and saw no struggle before he heard the

gunshot. After the shooting, Gray did not seek assistance but instead fled the scene. When Gray's mother asked him about Silvey's death, he callously responded that he was "glad the motherf***er's dead." Tr. Vol. 4, p. 166. Gray also got rid of the handgun used to shoot Silvey by exchanging it for another handgun. He told the person with whom he traded handguns that he shot a friend because that friend had allegedly set him up. Moreover, the jury was aware that Johnson was involved in the drug trade, as he considered himself a "middle man" of the drug dealer. Tr. Vol. 4, p. 84. Under these facts and circumstances, we are confident that the exclusion of the evidence regarding Johnson's reputation did not contribute to Gray's conviction.

### III. Admission of the Handgun

[29] Gray next argues that the trial court abused its discretion when it admitted into evidence the S&W handgun Gray traded for the Taurus handgun he used to shoot Silvey, claiming that this evidence was irrelevant and unduly prejudicial. As noted above, we review the trial court's ruling on this matter only for an abuse of discretion. *Laird*, 103 N.E.3d at 1175.

[30] Evidence Rule 401 provides that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence," and "(2) the fact is of consequence in determining the action." Generally, evidence of weapons possessed by the defendant but not used in the crime for which the defendant is charged should not be introduced because the evidence is irrelevant and highly prejudicial. *Stringer v. State*, 853 N.E.2d 543, 547 (Ind.

Ct. App. 2006) (citing *Oldham v. State*, 779 N.E.2d 1162, 1174 (Ind. Ct. App. 2002), *trans. denied*).

[31] Here, however, evidence of the S&W handgun was not irrelevant. Although the S&W handgun was not used to shoot Silvey, Gray did exchange the Taurus handgun used to shoot Silvey for the S&W handgun. Thus, his disposal of the murder weapon by exchanging it for the S&W weapon is evidence of his consciousness of guilt. *See Banks v. State*, 257 Ind. 530, 538, 276 N.E.2d 155, 159 (1971) (holding that evidence of defendant's subsequent disposition of the murder weapon was competent evidence of the consciousness of guilt).

[32] The S&W handgun was also relevant to prove the charge of obstruction of justice. The State charged Gray with obstruction of justice by "remov[ing] a Taurus revolver with intent to prevent it from being produced or used as evidence in any official proceeding or investigation." Appellant's App. Vol. 3, p. 78. Thus, evidence regarding the S&W handgun was relevant to show that he traded that gun for the Taurus handgun used in the shooting. Because the S&W handgun was relevant to show consciousness of guilt and to prove the obstruction of justice charge, the trial court did not abuse its discretion by admitting evidence of that weapon.

## IV. *Appropriateness of Gray's Sentence*

[33] Lastly, Gray claims that his ninety-eight-year sentence is inappropriate. Indiana Appellate Rule 7(B) provides that the court on appeal "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the

Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Still, we must exercise deference to a trial court's sentencing decision, because Rule 7(B) requires us to give due consideration to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* Thus, although we have the power to review and revise sentences, the principal role of appellate review should be to attempt to "leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

[34] Our review under Rule 7(B) should focus on "the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* The appropriate question is not whether another sentence is more appropriate, but whether the sentence imposed is inappropriate. *Rose v. State*, 36 N.E.3d 1055, 1063 (Ind. Ct. App. 2015). It is the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)).

[35] Gray was convicted of murder, Level 6 felony obstruction of justice, and Class A misdemeanor attempted dealing in marijuana. The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3. The sentencing range for a Level 6 felony is six months to two and one-half years, with an advisory sentence of one year. I.C. §

35-50-2-7(b). And a person convicted of a Class A misdemeanor can be imprisoned for up to one year. I.C. § 35-50-3-2. Thus, even without any statutory enhancements, Gray faced a maximum sentence of sixty-seven and one-half years. In addition, as a result of the habitual offender adjudication, the trial court was required to impose an additional term of between six and twenty years. I.C. § 35-50-2-8(i)(1). And for the firearms enhancement, the trial court was authorized to impose an additional term of five to twenty years.[1] In total, Gray faced a maximum sentence of one-hundred seven and one-half years.

[36] The trial court sentenced Gray to ninety-eight years, imposing a concurrent term of sixty years on the murder, obstruction, and dealing convictions with an additional term of twenty years for the firearms enhancement and an additional eighteen years for the habitual offender enhancement.

[37] There is nothing about the nature of the offense that supports Gray's claim that his sentence is inappropriate. This was truly a senseless killing. Gray shot a purported friend in the back of the head, execution style, because Johnson stole $700 from him and Gray apparently thought Silvey was involved. Gray even told his own mother that he was glad that Silvey was dead, using vulgar language to describe his victim. Gray fled from the scene and disposed of the murder weapon by trading it for another weapon. He told the person with

---

[1] The trial court was permitted to apply both the habitual offender enhancement and the firearm enhancement to Gray's conviction for murder. *See Woodruff v. State*, 80 N.E.3d 216, 218 (Ind. Ct. App. 2017), *trans. denied*.

whom he traded guns that he had shot a friend because that friend had set him up.

[38] Gray's character also does nothing to convince us that his sentence is inappropriate. At the relatively young age of twenty-eight at the time of sentencing, Gray had already been convicted of five prior felonies and three misdemeanors. Specifically, in 2009, he was convicted of Class B felony burglary and Class D felony theft. He subsequently violated the terms of his community corrections in that case and was ordered to serve the remainder of his previously suspended sentence in prison. In 2014, Gray was convicted of Class D felony possession of a controlled substance and sentenced to probation. He repeatedly violated the terms of his probation in that case, which was ultimately revoked, and he was ordered to serve the sentence in prison. Also in 2014, Gray was convicted of Class D felony resisting law enforcement. He was again given a suspended sentence, and he again violated the terms of his probation and had his probation revoked. In 2017, Gray was convicted of Level 6 felony escape for fleeing home detention. In addition, Gray was on supervised release in two other cases at the time he committed the instant offense.

[39] Considering the brutal nature of Gray's offense, his history of criminal activity, and his repeated failure to abide by the terms of his probation, we are unable to say that he has carried the burden of showing that his ninety-eight-year sentence is inappropriate. To be sure, a ninety-eight-year sentence is severe, but he committed a brutal, senseless murder, and he has not shown himself amenable to less harsh sentences in the past.

# Conclusion

The trial court did not abuse its discretion by denying Gray's motion to dismiss. Even though the State failed to properly preserve the victim's car for further inspection, the car was not material exculpatory evidence and was merely potentially useful evidence. Thus, Gray was required to show bad faith on the part of the State, and there was sufficient evidence showing an absence of bad faith on the part of the police. The trial court did not abuse its discretion by excluding evidence of Johnson's violent character, as this evidence was prohibited by the relevant rules of evidence, and there was no indication that Gray knew of Johnson's character at the time of the shooting. Similarly, the trial court did not err in admitting evidence of the S&W handgun Gray traded in exchange for the murder weapon as this evidence was relevant to show consciousness of guilt and also relevant to show that Gray committed obstruction of justice by disposing of the murder weapon. Lastly, Gray's ninety-eight-year sentence, although severe, is not inappropriate given the brutal nature of Silvey's murder and Gray's character as evidenced by his prior criminal history. For all these reasons, we affirm the judgment of the trial court.

Affirmed.

Robb, J., and Pyle, J., concur.