Willie SIMS, Appellant,

v.

STATE of Indiana, Appellee.

No. 582S181.

Supreme Court of Indiana.

Nov. 28, 1983.

John L. Kelly, Jr., Gary, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Aimee L. Kolze, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

This appeal arises from Sims' second trial on the events described. His first conviction was overturned by this Court as reported at *Sims v. State,* (1980) Ind., 413 N.E.2d 556.

Appellant was convicted by a jury of Kidnapping, a Class A felony and was sentenced to twenty (20) years imprisonment.

The facts are these. Robert Pioch and a friend, Charles Mann, were driving Pioch's car in Gary, Indiana. Around midnight they pulled into the parking lot of a taco restaurant in a "red light" district of the city. They met a Larry Wheaton in the lot and inquired of him where the women were. They gave him a ride to a nearby bar which Wheaton entered. He reappeared shortly thereafter and said two women were inside the bar waiting. Pioch and Mann then said they were just joking and Wheaton reentered the car and they drove Wheaton home. On the way, Wheaton offered them marijuana and Mann indicated he would buy $10 worth. At Wheaton's apartment building they entered a basement level apartment. Upon entry they were confronted by two additional men, the appellant and Albert Larkins. The trio of men demanded money and Mann said he would not pay until he saw the marijuana. Appellant then hit Pioch in the head with a baseball bat. Pioch and Mann were forced to remove their shoes and socks and their wallets were taken. Mann was taken into another room of the apartment by Larkins while appellant and Pioch remained in the living room of the apartment. Appellant hit Pioch on several occasions while Larkins assaulted Mann. Knives were drawn on both men.

After a few hours of this treatment, Pioch talked appellant and Larkins into a deal. Appellant and Paul Smith, another resident of the apartment complex, were to take Pioch to his apartment in Portage and obtain from him personal property of value. Larkins was to remain at the apartment with Mann until Smith and appellant returned. A deadline was set so that if appellant and Smith had not returned by 5:00

A.M. Larkins was to inject Mann with battery acid. After arriving at Pioch's apartment, Pioch managed to escape and call the police. Appellant and Smith fled back to Gary where they were apprehended by the police at the apartment. Larkins was also captured then and Mann escaped any further harm.

■ Appellant contends there was insufficient evidence to support the verdict. This Court will neither reweigh the evidence nor judge the credibility of the evidence. *Bray v. State,* (1982) Ind., 430 N.E.2d 1162.

The record shows appellant knowingly participated in the confinement of Mann for the purpose of using him as a hostage. Mann was confined in a closet and guarded by Larkins while appellant and Smith went to Portage. It is apparent the purpose of the confinement was to insure the cooperation of Pioch in obtaining the items of value from his residence.

■ The appellant alleges, because he was not found guilty of the kidnapping of Pioch, it would be unreasonable to conclude he had the intent to hold Mann as a hostage. We disagree. The two events are independent of one another. The jury could have concluded Pioch willingly accompanied Smith and appellant and still believe Mann was being held as an incentive for Pioch's cooperation. Appellant also alleges the decision of Larkins and Smith to hold Mann as a hostage cannot be imputed to him because he was not present when the decision was made. This allegation is erroneous on two grounds. Testimony showed all three men communicated concerning Pioch's plan and that appellant was eager to act upon the plan. The evidence presented indicates appellant knew what was happening even if he did not help plan the kidnapping. Sufficient evidence to support the verdict was presented.

■ Appellant's second issue concerns his proposed instruction on the possible lesser included offense of criminal confinement. In reaching a decision whether or not to give the instruction, the judge should look to the language of the statute and to the language of the charging information to determine if a lesser crime is included within the greater crime. If a lesser offense exists, then the judge must review the evidence produced at trial to determine if the issues of a lesser included offense have been raised. If no such issues exist, then the instruction should not be given. *Alstatt v. State,* 455 N.E.2d 323 (1983); *Roddy v. State,* (1979) Ind.App., 394 N.E.2d 1098; *McNary v. State,* (1981) Ind., 428 N.E.2d 1248.

■ The two statutes in question are I.C. § 35–42–3–2 and I.C. § 35–42–3–3 which are as follows:

"35–42–3–2. Kidnapping.—(a) A person who knowingly or intentionally confines another person:

(1) With intent to obtain ransom;

(2) While hijacking a vehicle;

(3) With intent to obtain the release, or intent to aid in the escape, of any person from lawful detention; or

(4) With intent to use the person confined as a shield or hostage; commits kidnapping, a class A felony.

"35–42–3–3. Criminal confinement. —A person who knowingly or intentionally:

(1) Confines another person without his consent; . . . ."

The State at its discretion chose not to file an information alleging the lesser offense. In view of the language of the statute and the evidence produced, the trial judge was justified in finding that no issue of included offense existed. We find the trial court correctly refused to give the instruction.

Appellant's third issue concerns testimony given by Paul Smith, one of the participants in the crime. Smith was used as a rebuttal witness following appellant's testimony in his own behalf. During cross-examination, appellant's counsel sought to examine Smith concerning plea bargain agreements between Smith and the State. The trial court limited the range of cross-examination. Smith had pleaded guilty to

two counts of robbery and two counts of kidnapping in the present case and to a count of second degree murder in an unrelated matter. Smith and the State agreed that Smith would testify against his accomplices in the murder and, in return, Smith would serve all five sentences concurrently. Under the agreement Smith was not to testify in appellant's trial. In fact, appellant had already gone to trial the first time on these charges and been convicted. In testimony given out of the hearing of the jury, Smith spoke concerning his understanding of the agreement.

"Q. And what was your understanding to exactly what was going to happen to you in both the four cases at hand and the murder case?

"A. He explained to me that If I pled guilty to both charges, they would run concurrently.

And if I would come back and testify against my . co-defendants in the murder charges—

"Q. When you say both charges, you're talking about the kidnapping, robbery, and the murder case?

"A. Yes.

"Q. What is it, one is one case, and one is another case; is that correct?

"A. Yes.

"Q. And did he say if you pled guilty on the two counts of kidnapping and robbery, there would be a written plea agreement for the murder case?

"A. Yes.

"Q. You knew when you pled guilty for the two counts of kidnapping and two counts of robbery that you were going to be entering into a written plea agreement with the State?

"A. Yes.

"Q. And you knew that the time you were to get here would run concurrently with the murder case?

"A. Yes.

\*    \*    \*    \*    \*    \*

"Q. And you were to cooperate with the State of Indiana, at least on the murder case; isn't that correct?

"A. As to my understanding, that is correct.

"Q. At the time that you pled guilty in the instant case, what had happened to your other co-defendants?

"A. What case are you talking about?

"Q. The kidnapping and robbery case here.

"A. To my knowledge, the two were already convicted. (R. 478–481.)

Appellant contends this testimony does not encompass all of the agreement. He concedes the written agreement was reached after appellant's first trial. However, he suggests Smith would not now be testifying unless the first agreement included promises to testify at subsequent retrials of any of the defendants in any of the prior trials or that Smith had extracted additional compensation for his testimony against appellant on this occasion. When questioned concerning other agreements, Smith said,

"Q. None the less [sic], Mr. Smith, were you ever at any time offered anything in return to testify against Willie Sims?

"A. No.

"Q. And again, have I offered you anything for your testifying here today?

"A. Nothing whatsoever.

"Q. Why are you testifying here today?

"A. To my understanding, the State of Indiana asked me back to testify against Willie Sims.

"Q. And you're going along with that voluntarily?

"A. Yes.

"Q. You have no other reason?

"A. No." (R. 482–483.)

The trial court allowed appellant's counsel to question Smith concerning the agreement as it applied to the murder trial and to the punishments Smith was to receive for all five crimes. The trial court did not

allow counsel to question Smith concerning an agreement to testify in this matter. The appellant contends this was error.

We hold the trial court did not err in restricting appellant's cross-examination. Agreements between the State and potential witnesses must be disclosed. *Giglio v. U.S.,* (1972) 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104; *Newman v. State,* (1975) 263 Ind. 569, 334 N.E.2d 684. However, in the case at bar, appellant has failed to show any additional agreement exists. The State has a duty to disclose these agreements and it contends none exist. The witness contends no agreement exists and the appellant has shown no other evidence of such an agreement. We believe this case is analogous to the decisions in *Campbell v. State,* (1980) Ind., 409 N.E.2d 568 and *Bubb v. State,* (1982) Ind.App., 434 N.E.2d 120. In those cases questions existed as to whether or not there were agreements. In *Campbell,* no agreement existed and in *Bubb* only preliminary discussions had occurred when witnesses testified agaisnt the defendant. We held in both cases the trial court did not err in refusing a disclosure of possible agreements. The allegation of a defendant does not create an agreement nor should questioning about a nonexistent agreement be used to discredit the testimony of a witness.

The trial court is in all things affirmed.

All Justices concur.