


FILED

Apr 14 2025, 8:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Salvador A. Jones,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

April 14, 2025

Court of Appeals Case No.
24A-CR-1102

Appeal from the Floyd Circuit Court

The Honorable Justin B. Brown, Judge

Trial Court Cause No.
22C01-2109-F5-1582

---

**Opinion by Judge Mathias**
Judges Foley and Felix concur.

**Mathias, Judge.**

[1] Salvador A. Jones appeals his conviction for Level 5 felony robbery. Jones raises eight issues for our review, which we consolidate and restate as the following five issues:

> 1. Whether Jones properly invoked his right to be tried within 180 days under the Interstate Agreement on Detainers ("IAD").
>
> 2. Whether Jones's right to counsel under the Sixth Amendment to the United States Constitution attached prior to his initial hearing before an Indiana judicial officer, and whether his right to counsel under Article 1, Section 13 of the Indiana Constitution attached prior to Indiana officials taking custody over him.
>
> 3. Whether the trial court committed fundamental error when it permitted the State to use self-authenticating affidavits as part of the foundation for the admissibility of surveillance videos and photographs.
>
> 4. Whether the trial court abused its discretion in the admission of certain evidence.
>
> 5. Whether Jones's six-year sentence is inappropriate in light of the nature of the offense and his character.

[2] We affirm.

## Facts and Procedural History

[3] Between April 2 and April 22, 2021, three banks were robbed in or near Louisville, Kentucky. In each robbery, a black man around 5'7" or 5'8" and

170 to 200 pounds entered the bank wearing a face mask and a dark hoodie with the hood up. In the last two, the robber handed a written note to the tellers demanding cash. In each case, the teller surrendered cash and the robber fled the scene.

[4] In the mid-morning hours of April 29, a black man between 5'6" and 5'9" with a "medium build" entered a U.S. Bank branch in New Albany. Tr. Vol. 4, p. 65. He was wearing a face mask and a dark hoodie with the hood up. He handed a note to one of the tellers demanding cash; the teller complied; and he fled the scene. The next day, a person fitting that description and acting in that same manner robbed another bank in Louisville. Louisville and New Albany detectives coordinated their investigations and identified a black Toyota Venza as a vehicle common to the proximity of all but one of the banks near the times they were robbed.

[5] On May 5, a person matching the descriptions from the other robberies entered another bank in Louisville, handed the teller a note demanding cash, received cash, and fled the scene. Responding Louisville law enforcement officers immediately put out an alert for a black Toyota Venza. Indian Hills Police Department Officer William Duncan was driving his patrol vehicle to the bank in response to the robbery when he received the alert for a black Toyota Venza. He immediately observed a vehicle matching that description heading in the direction opposite from the bank.

Officer Duncan began to follow the Venza, which, after some very careful operation,[1] "t[ook] off at a very high rate of speed." Tr. Vol. 5, p. 17. Officer Duncan lost sight of the Venza. However, a report on the Venza's license plate number revealed that the vehicle was registered to Nikira Gibbs, Jones's wife.

Kentucky officers went to Gibbs's residential address and encountered her standing near the street with her cell phone. Prior to the arrival of the officers, Jones had called Gibbs and instructed her to report the Venza as a stolen vehicle; she was in the process of making that report when officers arrived at her residence. Officers showed her photographs of the suspected robber, and Gibbs had "an emotional response" but did not explicitly say the suspect was Jones. Tr. Vol. 6, p. 120. She did identify the Venza in the photographs as hers.

A few days later, officers obtained a warrant to "ping" Jones's cell phone; that ping showed that he was in Nashville, Tennessee. Tr. Vol. 3, p. 208. When Tennessee law enforcement officers located Jones, he was wearing a wig. Louisville Metro Police Department Officer Benjamin Dean interviewed Jones while he was in the custody of Tennessee law enforcement; in that interview, Jones confessed to having robbed the Kentucky banks, but, when asked "if he

---

[1] The officer testified as follows:

> Q [by the State:] Okay. And how is that vehicle being operated?
>
> A    We are doing the speed limit. He's using his turn signals the whole time.
>
> Q    Is that normal for . . . traffic in that area?
>
> A    No, ma'am.

Tr. Vol. 5, p. 16.

had committed any robberies outside of Louisville," Jones responded that "he had never been to New Albany." *Id.* at 216. Officer Dean noted that he had "never mentioned New Albany." Tr. Vol. 4, p. 211. Jones also informed officers on where to find the Venza, which officers had not yet located.[2] And, in ensuing phone calls made from a jail, Jones relayed details about several of the robberies that were not publicly known. Officers also obtained, via a search warrant, Jones's historical cell-site location information ("CSLI"). The CSLI placed Jones near the New Albany bank at the time of its robbery.

[9] In September 2021, the State charged Jones in relevant part with Level 5 felony robbery. At that time, Jones was incarcerated in federal prison in Kentucky and facing federal charges for the Kentucky robberies. Jones was later found guilty of those offenses and remanded into federal custody.

[10] While in federal custody, Jones sent letters to the Floyd County prosecutor and trial court requesting disposition of the State's charge against him. However, he did not submit an IAD request to any of his custodial officials. On April 20, 2023, the Floyd County prosecutor sent an IAD detainer request to officials at the federal prison in custody of Jones.[3] Jones was then officially informed of the detainer and his rights under the IAD. On November 13, Indiana officials took

---

[2] In the one robbery in which the Venza was not identified in nearby surveillance videos, Jones stated that he had taken a bus to and from the bank.

[3] It is not clear whether the detainer request occurred on April 20 or April 28, 2023. The prosecutor appears to have made the request on April 20. Ex. Vol. 8, p. 19. But the Federal Bureau of Prisons recorded the request as "lodged . . . on April 28, 2023." *Id.* at 26. We use the April 20 date in this opinion. The difference is immaterial to our analyses.

custody over Jones, and he had his initial hearing before the trial court the next day.

[11] On November 15, Jones moved to dismiss the State's charge against him as untimely under the IAD, which the trial court denied. The court then held Jones's trial in May 2024, and a jury found him guilty of Level 5 felony robbery. The trial court entered its judgment of conviction and sentenced Jones accordingly.

[12] This appeal ensued.

## 1. Jones did not properly invoke his right under the IAD to be brought to trial within 180 days of the State's detainer request.

[13] On appeal, Jones first contends that the trial court erred when it denied his motion to dismiss because he was not timely brought to trial under the IAD. This issue presents us with questions of law we review de novo. *E.g.*, *State v. Robinson*, 863 N.E.2d 894, 896 (Ind. Ct. App. 2007), *trans. denied*. As our Supreme Court has made clear, the "procedures [of the IAD] are not mere technicalities and . . . require[] strict compliance." *State v. Greenwood*, 665 N.E.2d 579, 582 (Ind. 1996).

[14] As we have explained:

> both Indiana and Kentucky are parties to the IAD. In relevant part, this statute provides that
>
>> [w]henever a person has entered upon a term of imprisonment in a penal or correctional institution of a

> party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint *on the basis of which a detainer has been lodged against the prisoner,* he shall be brought to trial within one hundred eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint.

> [Ind. Code] § 35-33-10-4 (emphasis added). . . . Once a detainer is filed, the defendant may file a request for final disposition, which triggers the requirement that he be brought to trial within 180 days. . . .

*Robinson*, 863 N.E.2d at 896. Thus, the "filing of a formal detainer" is a prerequisite to a defendant being able to "avail himself of the 180-day time limit set forth in the IAD." *Id.* at 897.

[15] Here, much of Jones's argument relies on documents that predate the Floyd County prosecutor's formal detainer request on April 20, 2023. *See* Appellant's Br. at 18-20. But those documents are of no moment because it is the filing of the detainer that activates the ability of the defendant to *then* avail himself of the 180-day time limit. *Id.* at 896-97. We therefore decline to consider the documents Jones relies on that predate April 20, 2023.

[16] Jones also relies on letters he wrote on May 12 and May 19, 2023, which he sent directly to the trial court's clerk and which were filed to the trial court's docket on May 30. But the IAD states that a defendant who desires to avail

himself of the 180-day time limit "shall" send that request "to the warden, commissioner of correction[,] or other official having custody of him," and that official shall, in turn, submit it with proper certification to the prosecuting official and the appropriate court. I.C. § 35-33-10-4(3)(b). Our Supreme Court has expressly held that that language means that the defendant cannot simply deliver his request to the prosecuting attorney and the appropriate court; he must deliver it through his custodial authority. *Greenwood*, 665 N.E.2d at 581-82. Jones did not deliver either his May 12 request or his May 19 request through his custodial authority; he therefore cannot rely on those requests.

[17] Jones also asserts that he submitted one of his pre-April 20 requests to his custodial authority, and, thus, his custodial authority erred in stating that Jones had not invoked his 180-day request with federal officials. But Jones is again mistaken when he relies on a pre-April 20 request, and he has submitted no evidence of a post-April 20 request that he provided to his custodial authority.

[18] Finally, Jones argues that we are being "hyper-technical" in our reading and application of the IAD when, across time, he did give his custodial authority, the prosecutor, and the court notice of his desire to be tried within 180 days. Appellant's Br. at 24. But Jones's argument is contrary to law. Again, the "procedures [of the IAD] are not mere technicalities and . . . require[] strict compliance." *Greenwood*, 665 N.E.2d at 582. Jones seeks to avoid strict

compliance for a "broader and more liberal" approach under the IAD. Appellant's Br. at 25. We reject his theory of relief on this issue.[4]

## 2. Neither Jones's Sixth Amendment right to counsel nor his Article 1, Section 13 right to counsel attached prior to November 2023.

[19] Jones next asserts that, in his May 12, 2023, letter to the trial court, he requested the appointment of counsel, which he did not receive. Jones thus argues that the trial court denied him his right to counsel under both the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution when the court did not immediately appoint him counsel pursuant to that request, which he contends was prejudicial to him as he could have used the assistance of legal counsel to properly navigate the IAD process. We review such questions de novo. *E.g.*, *Morales v. Rust*, 228 N.E.3d 1025, 1033 (Ind. 2024).

[20] But we initially address the State's assertion that Jones's singular right-of-counsel analysis in his brief, which encompasses both of his arguments under the United States and Indiana Constitutions, is insufficient to preserve both issues. *See* Appellee's Br. at 32 n.6. Our case law lacks clarity on the issues presented by Jones, and the State's responsive brief, which addresses the merits of Jones's arguments but does not recognize the threshold questions we address

---

[4] The State also argues that Jones was timely brought to trial under Indiana Code section 35-33-10-4(4). Jones does not suggest otherwise in his brief on appeal, and we therefore do not consider that question.

below, proves the point. We therefore decline to resolve either of Jones's right-to-counsel arguments under a theory of waiver and instead decide them separately on their merits. *E.g.*, *Hayko v. State*, 211 N.E.3d 483, 491-92 (Ind. 2023) (reaching the merits of an argument that was omitted by the parties because "their omissions illustrate a larger, confusing trend in Indiana caselaw").

## 2.1. There is no Sixth Amendment right to counsel in Indiana prior to the initial hearing before an Indiana judicial officer.

[21] The trial court was not obliged under the Sixth Amendment to appoint counsel for Jones in response to his May 12, 2023, request. The Supreme Court of the United States has made clear that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 213 (2008).

[22] Here, at the time he sent the May 12, 2023, request, Jones was in federal custody in Kentucky. He did not have his initial hearing before the Indiana trial court on the Indiana charge until November 14, 2023. Therefore, Jones's Sixth Amendment right to counsel on the Indiana charge did not exist prior to November 14, 2023. *Id.*

[23] We acknowledge that, in *Winston v. State*, 263 Ind. 8, 11-12, 323 N.E.2d 228, 230 (1975), our Supreme Court interpreted a plurality opinion of the Supreme

Court of the United States in *Kirby v. Illinois*, 406 U.S. 682, 684, 688 (1972) (plurality opinion), to say that the Sixth Amendment right to counsel attaches in Indiana upon the filing of an information. But the Court in *Rothgery* made clear that that is incorrect. 554 U.S. at 202-03. The *Rothgery* Court concluded that the concern for when the Sixth Amendment right to counsel attaches is not when charges are formally filed but when "the government has committed itself to prosecute, the adverse positions of government and defendant have solidified, and the accused finds himself faced with the prosecutorial forces of organized society[] and immersed in the intricacies of substantive and procedural criminal law." *Id.* at 198 (cleaned up). The Court concluded that that happens at the defendant's first appearance before a judicial officer, which is also when the vast majority of the States, including Indiana, "take the first step toward appointing counsel." *Id.* at 203-04 & 204 n.14 (citing, *inter alia*, I.C. §§ 35-33-7-5, -6 (West 2004)).

[24] Thus, *Rothgery* has superseded our Supreme Court's interpretation in *Winston* as to when the Sixth Amendment right to counsel attaches in Indiana. We are, of course, obliged to follow *Rothgery* on this question of federal law. Accordingly, the trial court did not err under the Sixth Amendment when it did not appoint counsel for Jones prior to the November 14, 2023, initial hearing because Jones's Sixth Amendment right to counsel had not attached prior to that date.

## 2.2. There is no Article 1, Section 13 right to counsel prior to the defendant being in the custody of Indiana officials.

[25] We thus consider whether Jones's May 12, 2023, request required the trial court to appoint him counsel under Article 1, Section 13 of the Indiana Constitution. Whether Article 1, Section 13 of the Indiana Constitution applies to a defendant who is in the custody of foreign officials and engaged in the IAD process is a question of first impression for Indiana's courts.

[26] Article 1, Section 13 provides in relevant part that, "[i]n all criminal prosecutions, the accused shall have the right . . . to be heard by himself and counsel . . . ." As our Supreme Court has made clear, "[t]he right to counsel protections afforded through Article 1, Section 13[] . . . are sometimes broader than those flowing from the Sixth Amendment—particularly in the context of invocation of the right and when the right attaches." *Jewell v. State*, 957 N.E.2d 625, 633-34 (Ind. 2011). With respect to when the right attaches, our Supreme Court has "long recognized" that it is the "right of an accused in this state to have counsel at all critical stages *following the point of arrest*."[5] *Sims v. State*, 274 Ind. 495, 501, 413 N.E.2d 556, 559-60 (1980) (emphasis added);[6] *see also Jewell*, 957 N.E.2d at 634 (citing cases).

---

[5] Our Supreme Court has used "arrest," "detained," and "custody" interchangeably in this context. *See, e.g.*, *McCoy v. State*, 193 N.E.3d 387, 388-89, 391 (Ind. 2022).

[6] At least five Indiana and federal opinions refer to our Supreme Court's 1980 opinion in *Sims* as having been overruled on other grounds by our Supreme Court's 1995 opinion in *Wright v. State*, 658 N.E.2d 563, 570 (Ind. 1995). *See Jones v. Brown*, 756 F.3d 1000, 1007 (7th Cir. 2014); *M.D. v. State*, 108 N.E.3d 301, 305 (Ind.

[27] Jones's argument under Article 1, Section 13 is premised on his assertion that that right to counsel attaches at the filing of an information. Appellant's Br. at 27. In support of his premise, Jones cites only a plurality opinion of our Supreme Court in *Hoy v. State*, 225 Ind. 428, 432-34, 75 N.E.2d 915, 917 (1947) (plurality opinion). But nothing in either that plurality opinion or the separate opinion concurring in the result (which had the vote of three Justices) declares that the right to counsel under Article 1, Section 13 attaches upon the filing of an information. To the contrary, as our Supreme Court made clear in *Sims*, the right attaches at the "point of arrest." 413 N.E.2d at 559-60. Indeed, our Supreme Court has recognized several occasions in which the right to counsel under Article 1, Section 13 applies after an arrest and *prior* to the filing of an information. *See, e.g.*, *Jewell*, 957 N.E.2d at 634; *see also Pirtle v. State*, 163 Ind. 16, 29, 323 N.E.2d 634, 640 (1975).

[28] But what our Supreme Court has never held is that the Article 1, Section 13 right to counsel attaches upon a defendant's arrest and custody in a *foreign jurisdiction*. And Jones provides no argument on appeal as to how it would be possible to even implement such a holding. We therefore conclude that the right

---

2018); *Ward v. State*, 903 N.E.2d 946, 957 (Ind. 2009); *Posso v. State*, 180 N.E.3d 326, 338 (Ind. Ct. App. 2021); *Miller v. State*, 846 N.E.2d 1077, 1081 (Ind. Ct. App. 2006), *trans. denied*. That is not correct. Our Supreme Court's 1980 opinion in *Sims* reversed the defendant's conviction under Article 1, Section 13 and remanded for a new trial. 413 N.E.2d at 560. After the retrial, the defendant again appealed and again ended up before our Supreme Court, and, in the second appeal, our Supreme Court discussed jury instructions on possible lesser included offenses. *Sims v. State*, 456 N.E.2d 386, 388 (Ind. 1983). It is the 1983 opinion's discussion of lesser included offenses, not any part of the 1980 opinion, that our Supreme Court overruled in *Wright*. *See Wright*, 658 N.E.2d at 570 (citing *Sims*, 456 N.E.2d at 388).

to counsel under Article 1, Section 13 attaches at the "point of arrest" by an *Indiana* official. Here, that means the point at which Indiana obtained physical custody over Jones, which was at the conclusion of the IAD process on November 13, 2023. He therefore had no right to counsel under Article 1, Section 13 prior to that moment, and the trial court did not err under the Indiana Constitution when it did not act on Jones's May 12, 2023, request.

### 2.3. The critical-stage analyses argued by the parties are not applicable where the right to counsel has not attached.

[29] The parties' right-to-counsel arguments on appeal focus on the right to counsel during a critical stage of a criminal proceeding. Appellant's Br. at 27-29; Appellee's Br. at 31-35. But the critical-stage question under both the United States Constitution and the Indiana Constitution is a *post-attachment* question. *See Rothgery*, 554 U.S. 211-12; *Sims*, 413 N.E.2d 559-60. That is, once the right to counsel has attached, a defendant must be afforded counsel at all critical stages of the proceeding *after that attachment*. *See Rothgery*, 554 U.S. 211-12; *Sims*, 413 N.E.2d 559-60. There is, legally at least, no such thing under either constitutional provision as a critical stage of a criminal proceeding prior to the attachment of the right to counsel. *See Rothgery*, 554 U.S. 211-12; *Sims*, 413 N.E.2d 559-60. Accordingly, the parties' arguments on appeal are nonstarters as neither of Jones's constitutional rights to counsel attached prior to the conclusion of the IAD process.

### 3. The trial court did not commit fundamental error when it permitted the State to use self-authenticating affidavits as part of the foundation for the admissibility of surveillance videos and photographs.

[30]  During Jones's jury trial on the Level 5 felony robbery charge, the State sought to admit certain surveillance videos and related photographs from businesses near the New Albany bank into evidence. As part of the foundation for that evidence, the State relied on self-authenticating affidavits. *See* Ind. Evidence Rule 902(11). Jones objected to those affidavits only on the ground that they lacked trustworthiness. Tr. Vol. 4, p. 128.

[31]  However, on appeal Jones furthers no argument on the trustworthiness ground he asserted at trial. Instead, he now contends that the State did not give him sufficient written notice of its intent to rely on the self-authenticating affidavits. *See* Evid. R. 902(11). As this was not the basis for Jones's objection to the affidavits in the trial court, he has not preserved this argument for appellate review. *See Treadway v. State*, 924 N.E.2d 621, 631 (Ind. 2010) ("A party may not add to or change his grounds for objections in the reviewing court.").

[32]  Thus, on appeal, Jones must demonstrate fundamental error in the State's use of the affidavits. To demonstrate fundamental error, an appellant must show that the alleged error "made a fair trial *impossible* or constituted a clearly blatant violation of *basic and elementary principles of due process* presenting an undeniable and substantial potential for harm." *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) (emphases added; quotation marks omitted). Fundamental error is

"extremely narrow" and "encompasses only errors so blatant that *the trial judge should have acted independently* to correct the situation." *Id.* (emphasis added; quotation marks omitted). Further, if the trial judge "could recognize a viable reason why an effective attorney might not object, the error is not blatant enough to constitute fundamental error." *Id.* (quotation marks omitted).

[33] Our Supreme Court has expressly limited the reach of the fundamental-error doctrine in claims of allegedly improper evidence:

> improperly seized evidence is frequently highly relevant, [and] its admission ordinarily does not cause us to question guilt. That is the case here. The only basis for questioning [the defendant's] conviction lies not in doubt as to whether [he] committed these crimes[] but rather in a challenge to the integrity of the judicial process. . . . Here, *there is no claim of fabrication of evidence or willful malfeasance on the part of the investigating officers and no contention that the evidence is not what it appears to be. In short, the claimed error does not rise to the level of fundamental error.*

*Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (emphasis added). We see no reason why a different rule should apply to affidavits that are used to establish a foundation for the admissibility of evidence.

[34] However, aside from simply saying so, Jones presents no argument supported by cogent reasoning as to how the State's use of the self-authenticating affidavits made a fair trial impossible or was a blatant due-process violation. He does not suggest on appeal that the affidavits were "not what [they] appear[ed] to be." *Id.* He simply asserts that he should have had more time to look over the affidavits before the trial court relied on them. That is not a basis for

fundamental error. *See Nix v. State*, 158 N.E.3d 795, 802 (Ind. Ct. App. 2020) ("Nix's argument on this issue would turn fundamental error from a rare exception to the general rule for appellate review."), *trans. denied*. Accordingly, we reject Jones's challenge to the self-authenticating affidavits.

## 4. The trial court did not abuse its discretion in the admission of the evidence.

[35] We next consider Jones's several challenges to the trial court's admission of certain evidence. A trial court has broad discretion regarding the admission of evidence, and its decisions are reviewed only for abuse of discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021). We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and the errors affect a party's substantial rights. *Id.*

### 4.1. The surveillance videos and photographs.

[36] Jones first asserts that the trial court abused its discretion when it admitted into evidence, over his objections, surveillance videos and related photographs from businesses near the U.S. Bank in New Albany at the time of that robbery. According to Jones, the videos and photographs were inadmissible under Indiana's silent-witness doctrine.

[37] Under the silent-witness doctrine, our trial courts may admit videos and photographs "as substantive rather than demonstrative evidence." *McCallister v. State*, 91 N.E.3d 554, 561 (Ind. 2018). To do so, "there must be a strong showing of authenticity and competency, including proof that the evidence was

not altered." *Id.* at 561-62. That is, "there must be adequate proof of the reliability of the process that produced what the photographs" or videos depict. *Stott v. State*, 174 N.E.3d 236, 246 (Ind. Ct. App. 2021).

[38] As we have explained:

> [Indiana's case law] addressing surveillance footage or images derived from that footage under the silent-witness theory establish[es] that the evidence may be admissible when there is testimony from someone with knowledge on the security system that produced the video or image, on the integrity of the system's process, and on whether video or image was altered. For example, in *McCallister v. State*, our supreme court found that testimony from a hotel manager authenticated "a DVD purporting to show surveillance video" of a hotel lobby by describing how the security system operated, by verifying the accuracy of the time-and-date stamp on the footage, and by indicating that the video showed what it purported to show. 91 N.E.3d at 561-62. Similarly, in *Flowers v. State*, the security director for a company that owned an apartment complex authenticated surveillance footage from the complex as well as several images derived from that footage "in several important respects." 154 N.E.3d 854, 869-70 (Ind. Ct. App. 2020). The director's testimony established that he was intimately familiar with the type of system in place, including how it worked, where the cameras were placed, and how the cameras operated. *Id.* at 869-70. He also accessed the footage multiple times and signed and dated the DVD to which the video had been saved. *Id.* at 870. Likewise, in *Rogers v. State*, a CVS supervisor authenticated surveillance footage and images derived from that footage through extensive testimony "regarding CVS's security system and the procedure he used to view, copy, and edit the footage." 902 N.E.2d 871, 877 (Ind. Ct. App. 2009).

*Id.* We have also acknowledged the importance of an appropriate foundation for such evidence given that "it is increasingly easier in today's digital age to manipulate or distort images." *Id.* at 247.

[39] As the State notes in its brief, all of the videos and photographs Jones now challenges were supported by the self-authenticating affidavits we discussed in part 3, *supra*. *See* Ex. Vol. 9, pp. 246-50; Ex. Vol. 10, pp. 2-15. And Jones does not assert that those self-authenticating affidavits were insufficient to satisfy the requirements of the silent-witness doctrine. Indeed, Jones's argument on this issue disregards the self-authenticating affidavits altogether, which we understand to mean that he has premised the viability of this argument on his theory that the self-authenticating affidavits should have been excluded under the fundamental-error doctrine. As we explained above, Jones's challenge to the self-authenticating affidavits under the fundamental-error doctrine fails. And, therefore, so does his derivative argument that the videos and photographs were not supported by a sufficient foundation under the silent-witness doctrine.

### 4.2. Evidence relating to the Kentucky robberies.

[40] Jones also asserts that the trial court erred under Indiana Evidence Rules 403 and 404(b) when it admitted into evidence testimony and exhibits relating to the Kentucky bank robberies.[7] Jones challenged the evidence in question under

---

[7] Specifically, this evidence consisted of witness testimony and exhibits relating to the April 2, 2021, robbery; witness testimony and exhibits relating to the April 8, 2021, robbery; a transcript of prior testimony relating to the April 22, 2021, robbery; a transcript of prior testimony and associated exhibits relating to the April 30,

those Rules during pretrial conferences, and, at the close of the final pretrial conference, the court informed Jones that it would "note your continuous and ongoing objection" to that evidence. Tr. Vol. 2, p. 207. Further, during the start of Jones's second day of trial, the court reiterated that Jones's continuing objection to the evidence was still in effect and would remain so "throughout trial." Tr. Vol. 3, p. 130. We therefore address Jones's challenge to this evidence on the merits.[8]

[41] As our Supreme Court has explained:

> Indiana Evidence Rule 404(b) serves to safeguard the presumption of innocence in favor of criminal defendants. The Rule's mandate is clear: a court may not admit evidence of another crime, wrong, or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evidence Rule 404(b)(1). This restriction prevents the jury from indulging in the "forbidden inference" that a criminal defendant's prior wrongful conduct suggests present guilt.
>
> But Rule 404(b) does not totally proscribe other-bad-acts evidence—only its use as character evidence. Indeed, the Rule

---

2021, robbery; witness testimony and video evidence relating to the May 5, 2021, robbery; and witness testimony and supporting exhibits from investigating Kentucky law enforcement officers.

[8] The State is correct that, during trial, Jones informed the court that he had "[n]o objection" to some parts of the body of evidence the State introduced relating to the Kentucky robberies. Tr. Vol. 3, pp. 89, 94, 142-43, 147-48. And the State is also correct that our Court has, on several occasions, stated that an assertion of "[n]o objection" forfeits the protections of a previously recognized continuing objection. *See, e.g.*, *Hostetler v. State*, 184 N.E.3d 1240, 1245-47 (Ind. Ct. App. 2022), *trans. denied*. However, we need not parse the record here between preserved issues and forfeited ones. The trial court admitted all of the evidence relating to the Kentucky robberies under the same rationale, and, thus, our review of that decision applies equally to all of that evidence.

plainly states that other-bad-acts evidence may be admissible for other purposes, and it provides an illustrative list—to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). So when the State claims that other-bad-acts evidence is admissible for a proper purpose, the trial court is tasked with deciding whether that evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act.

If the evidence passes that relevance test, it has to clear a second hurdle: Indiana Evidence Rule 403's balancing test. In applying Rule 403, the trial court must conclude that the evidence's probative value is not "substantially outweighed" by the danger of unfair prejudice—otherwise, the evidence is not admissible.

*Fairbanks v. State*, 119 N.E.3d 564, 568 (Ind. 2019) (cleaned up).

[42] Here, the State argued, and the trial court agreed, that the evidence relating to the Kentucky robberies was relevant under Rule 404(b)(2)'s identity exception.[9] As we have summarized:

> Evidence of other crimes admitted under the identity exception [is] *generally* evaluated based upon whether such crimes are "'signature' crimes with a common modus operandi." *Thompson v. State*, 690 N.E.2d 224, 234 (Ind. 1997). The rationale behind this exception "is that the crimes, or means used to commit them, were so similar and unique that it is highly probable that the same person committed all of them." *Id.* (citing *Lockhart v. State*, 609 N.E.2d 1093, 1097 (Ind. 1993)). While the "signature crime"

---

[9] The trial court instructed the jury that the evidence of the Kentucky bank robberies was admissible only for the purposes of establishing Jones's identity. The court further ordered the parties to omit all references to Jones's convictions for those robberies.

test focuses on similarity and uniqueness between the charged and uncharged conduct, we note that *in addition* courts have long considered "whether or not the evidence is so specifically and significantly related to the charged crime in time, place and circumstance as to be logically relevant to one of the particular excepted purposes." *Malone v. State*, 441 N.E.2d 1339, 1346 (Ind. 1982) (citing *Montgomery v. State*, 274 Ind. 544, 548, 412 N.E.2d 793, 795 (1980), *reh'g denied*; *Duvose v. State*, 257 Ind. 450, 451, 275 N.E.2d 536, 537 (1971)). Both "the timing and similarity of the incidents are factors in the larger inquiry into whether the incidents were relevant to a matter in issue." *Hicks[ v. State]*, 690 N.E.2d [215,] 222 [(Ind. 1997)].

*Bishop v. State*, 40 N.E.3d 935, 952 (Ind. Ct. App. 2015) (emphases added), *trans. denied*.

[43] Jones argues that the evidence relating to the Kentucky robberies was not admissible under Rule 404(b)(2)'s identity exception because there was nothing about the manner in which any of the instant robberies occurred that rose to the level of a "signature crime." *See* Appellant's Br. at 36-40. To paraphrase Jones's argument, there is nothing about a man of average height and build in a hoodie handing a note demanding cash to a teller that distinguishes any of the instant robberies from any other run-of-the-mill robbery.

[44] But the signature-crime test is a *subset* of Rule 404(b)(2)'s identity exception, not the whole of it. *Bishop*, 40 N.E.3d at 952-53 (quoting *Thompson*, 690 N.E.2d at 234). And the State can rely on Rule 404(b)(2)'s identity exception without establishing the requirements of a signature crime if "the evidence is so specifically and significantly related to the charged crime in time, place and

circumstance as to be logically relevant." *Id.* at 952 (quoting *Malone*, 441 N.E.2d at 1346).

[45] Jones does not argue on appeal that the evidence of the Kentucky robberies fails to satisfy the "time, place[,] and circumstance" logical-relevancy test. *See id.*; *see also* Ind. Appellate Rule 46(A)(8)(a). And we cannot say that the trial court abused its discretion in any event. All of the Kentucky robberies were within about one month of each other, with the New Albany robbery in between them. All of the Kentucky robberies were in or near Louisville, with the New Albany robbery a short distance away across the Ohio River. And Jones admitted to having committed the Kentucky robberies, which, regardless of whether they were committed in a "signature" way, were committed in the same way as the New Albany robbery. Accordingly, the trial court did not err in admitting the evidence of the Kentucky robberies under Evidence Rule 404(b)(2).

[46] And neither did the court err under Rule 403. The evidence was highly relevant, and, while it was undoubtedly prejudicial, it was not *unfairly* prejudicial. *See* Evid. R. 403; *see also Snow v. State*, 77 N.E.3d 173, 179 (Ind. 2017). We therefore affirm the trial court's admission of the State's evidence relating to the Kentucky bank robberies under Evidence Rules 403 and 404(b).

### 4.3. Transcripts of prior witness testimony.

[47] Jones next asserts that the trial court abused its discretion when it admitted into evidence transcripts of the testimony of two bank tellers from Jones's Kentucky trial. Jones argues that the admission of those transcripts violated his right to

confront the witnesses under the Sixth Amendment to the United States Constitution[10] and also constituted inadmissible hearsay. The rule dispositive to both of those arguments is the same for our purposes: if the witnesses were unavailable, the trial court acted within its discretion in admitting the transcripts. *See, e.g.*, *Berkman v. State*, 976 N.E.2d 68, 75-76 (Ind. Ct. App. 2012), *trans. denied*.

[48] There is no dispute that the State issued subpoenas to the two witnesses in question, Justin Miracle and Karla Humke, both of whom had last known addresses in Kentucky, on February 23, 2024. There is no dispute that, in doing so, the State followed the necessary statutory procedures and worked with Kentucky officials to attempt to serve the subpoenas. And there is no dispute that Kentucky officials were unable to locate and serve Miracle and Humke with those subpoenas.

[49] Still, Jones asserts that the trial court erred in admitting the transcripts of those two prior witnesses' testimony because the State did not issue the subpoenas early enough prior to his May 11 trial date. But the State acted in plenty of time to serve the subpoenas based on known information, and Jones cites no authority that requires the State to account for potential unknowns in the timing of issuing a subpoena. We therefore conclude, based on the totality of the circumstances before it, that the trial court acted within its discretion when it

---

[10] Jones does not argue that his right to face-to-face confrontation under Article 1, Section 13 of the Indiana Constitution was violated.

determined that Miracle and Humke were unavailable at the trial and admitted the transcripts of their prior testimony.

### 4.4. CSLI evidence.

[50] Jones also challenges the trial court's admission of the State's CSLI evidence. In particular, Jones asserts that the CSLI evidence was not properly authenticated; that the State did not give Jones proper notice under Evidence Rule 902(11) of the self-authenticating affidavit in support of the CSLI evidence; and that the State's witness who testified in support of the CSLI evidence did not rely on a properly scientific computer program to analyze the CSLI evidence.

[51] Jones's argument that the CSLI evidence was not properly authenticated is a nonstarter. He contends that the self-authenticating affidavit in support of the CSLI evidence was not proper because the affidavit lacked a notary's signature. Jones cites no authority that requires a notary's signature in order for an affidavit to be used as foundation evidence. And he does not argue that the affidavit was otherwise insufficient on its face to meet our self-authentication requirements.

[52] Jones's argument that the State did not give him proper notice of the self-authenticating affidavit is likewise meritless. We understand his argument here to be that the self-authenticating affidavit was signed after the final pretrial conference, but Jones is simply incorrect. The self-authenticating affidavit was signed in September 2022 and provided to Jones well before the final pretrial

conference, which itself was several weeks before his trial. There is no error here.

[53] Neither did the trial court err when it permitted the State's witness, Louisville Metro Police Department Detective Timothy O'Daniel, to testify that Jones's CSLI showed that Jones was near the location of the New Albany bank at the time of its robbery. According to Jones, the trial court erred here because the mapping program Detective O'Daniel relied on was neither calibrated nor peer reviewed. Thus, he continues, the "technical and methodological bases for admitting the cell phone location records were insufficiently sound . . . ." Appellant's Br. at 49.

[54] But Jones cites no authority that requires a testifying law enforcement officer who regularly uses a cell-phone location mapping program to establish—or to even understand—any calibration or peer-review information for that program before he may testify to the program's output. Indeed, the authority Jones relies on discusses and describes expert testimony under Evidence Rule 702. However, we have repeatedly recognized that law enforcement officers need not have an expert-level understanding of cell-phone location mapping programs and may instead testify "based on [their] specialized training about general principles" in such matters. *McCowan v. State*, 10 N.E.3d 522, 533 (Ind. Ct. App. 2014), *summarily aff'd in relevant part*, 27 N.E.3d 760, 768 (Ind. 2015). Of course, Jones was free to present his own evidence to the jury challenging the reliability of the cell-phone location mapping program, but he did not present any such evidence. The trial court did not abuse its discretion here.

### 4.5. Jail phone calls.

Jones's last evidentiary challenges are to the admission of the recordings of his jail phone calls. According to Jones, the State's self-authenticating affidavit in support of those recordings was insufficient because a notary did not certify the affidavit or indicate that the affidavit was sworn under oath. As we noted in part 4.4, *supra*, there is no notary requirement for self-authenticating affidavits, and, thus, this argument fails.

Jones also argues that the affidavits were not timely provided to him. But we agree with the State that Jones has not preserved that argument for our review because he stated only a different ground for his objection to the recordings at trial. *See* Tr. Vol. 3, pp. 220-23. And neither is Jones's bald claim of fundamental error on appeal persuasive. There is therefore no error on this issue.

## 5. Jones's six-year sentence is not inappropriate.

The last issue in this appeal is whether Jones's six-year sentence is inappropriate in light of the nature of the offense and his character. Under Indiana Appellate Rule 7(B), we may modify a sentence that we find is "inappropriate in light of the nature of the offense and the character of the offender." Making this determination "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[58] Sentence modification under Rule 7(B), however, is reserved for "a rare and exceptional case." *Livingston v. State*, 113 N.E.3d 611, 612 (Ind. 2018) (per curiam). Thus, when conducting this review, we generally defer to the sentence imposed by the trial court, and that deference will prevail unless the defendant demonstrates compelling evidence on appeal that portrays the nature of the offenses and his character in a positive light, such as showing a lack of brutality in the offenses or showing substantial virtuous character traits. *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[59] Jones's Level 5 felony conviction carries a sentencing range of one to six years with an advisory term of three years. I.C. § 35-50-2-6(b). The trial court gave Jones the maximum term. The trial court relied in notable part on Jones's extensive criminal history and that he committed the instant offense while released on parole.

[60] We affirm Jones's sentence. Jones is a serial robber. He robbed the New Albany bank as part of a month-long robbery spree across two states. He has two other robbery convictions along with several other prior convictions and juvenile adjudications. And he had been released on parole for six months prior to engaging in this particular spree of robberies. Jones's argument for a revised sentence on appeal is not persuasive, and we reject it.

## Conclusion

[61] For all of these reasons, we affirm Jones's conviction and sentence.

[62] Affirmed.

Foley, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

Andrew R. Rutz
Law Office of Andrew R. Rutz
New Albany, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana